Vincent Christian STOPHER,
Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 1998–SC–0334–MR.

Supreme Court of Kentucky.

April 26, 2001.

As Amended Aug. 15, 2001.

Rehearing Denied Nov. 21, 2001.

Donna L. Boyce, Randall L. Wheeler, Department of Public Advocacy, Frankfort, for appellant.

A.B. Chandler III, Attorney General, Susan Roncarti, Elizabeth A. Heilman, Assistant Attorney General, Criminal Appellate Division, Frankfort, for appellee.

GRAVES, Justice.

Appellant, Vincent Stopher, was convicted in the Jefferson Circuit Court for the murder of Jefferson County Deputy Sheriff Gregory Hans, and sentenced to death. Appellant was also convicted and sentenced to five years for one count of wanton endangerment, and two years each for four counts of third-degree assault on police officers. Appellant pled guilty to being a second-degree persistent felony offender.

On March 10, 1997, Deputy Hans responded to a call made to the Louisville Police Department concerning a disturbance at Appellant's home. When Deputy Hans arrived at the location, Appellant approached the police cruiser and began striking Hans. Deputy Hans attempted to defend himself but Appellant pinned him to the seat of the cruiser with the result that Deputy Hans' left hand and arm were trapped beneath his body. Appellant unholstered Deputy Hans' handgun, pressed the barrel of the gun into Hans' face, and pulled the trigger. Immediately thereafter, Appellant got out of the police cruiser and pointed the gun at a witness, Steve Porter. Porter, afraid he was about to be shot, dropped to his knees and raised his hands. Appellant pulled the trigger, however, the gun jammed and would not fire. At this time, other officers arrived on the scene and apprehended Appellant. Witnesses stated that Appellant was enraged and shouted that he hoped the officer had died. Four officers were required to wrestle Appellant to the ground and handcuff him. While the officers were struggling with Appellant, he grabbed another officer's weapon and attempted to fire it.

Following an extensive and highly publicized trial, Appellant was found guilty of intentional murder and was sentenced to death. On appeal, Appellant raises thirty-three allegations of error. For conve-nience, we have categorized these issues into eight sections. To the extent that any error is unpreserved, it has been reviewed in accordance with the standard set forth in *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367 (1989), *cert. denied*, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1989), *overruled, in part, St. Clair v. Roark*, Ky., 10 S.W.3d 482 (1999), i.e., whether there was a reasonable justification or explanation for defense counsel's failure to object, and whether the totality of the circumstances is persuasive either that the defendant would not have been found guilty of a capital offense or that he would not have received the death sentence but for the unpreserved error. *See also Tamme v. Commonwealth*, Ky., 973 S.W.2d 13 (1998), *cert. denied*, 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999).

## I. PRETRIAL ISSUES

### 1. *Indictment*

Appellant's argument that the indictment failed to provide the requisite notice that he would be tried for a capital offense lacks merit. The indictment, which was returned on March 12, 1997, clearly charged Appellant with "Murder KRS 507.020 Capital Offense 20 years to life or death or life without parole for 25 years." Moreover, in July 1997, the Commonwealth filed a formal "Notice of Aggravating Circumstances," which stated that the case would be prosecuted as a capital case based on the aggravating fact that the "killing was intentional and the victim was a ... deputy sheriff, engaged at the time of the act in the lawful performance of his duties." Appellant concedes that at no time prior to this appeal did counsel complain of insufficient notice.

### 2. *Grand Jury Proceedings*

Appellant takes issue with several aspects of the grand jury proceedings.

We note at the outset that before a court will invade the province of the grand jury, "a defendant must demonstrate a flagrant abuse of the grand jury process that resulted in actual prejudice and deprived the grand jury of autonomous and unbiased judgment." *Commonwealth v. Baker*, Ky. App., 11 S.W.3d 585, 588 (2000).

First, Appellant urges this Court to declare unconstitutional that part of RCr 5.08 which provides: "If the defendant notifies the attorney for the Commonwealth in writing of his desire to present evidence before the grand jury, the attorney for the Commonwealth shall so inform the grand jury. The grand jurors may hear evidence for the defendant but are not required to do so." Appellant argues that requiring a defendant to go through the Commonwealth's attorney, the adversarial party, in order to present evidence to the grand jury is a constitutional violation. Appellant cites no authority for his position, and we are of the opinion that since the Commonwealth is charged with assisting the grand jury, it is, in fact, the appropriate party to inform the grand jury that a defendant wishes to present evidence. RCr 5.41. There is no constitutional right to appear before the grand jury; RCr 5.08 is an indulgence of this Court. We find no distinction for a capital case.

Next, Appellant argues that under RCr 5.02(c), and §§ 2 and 109 of the Kentucky Constitution, the trial court was required to instruct the grand jury on the entire law concerning homicide. Appellant theorizes that the grand jury was required to start with the most basic offense, reckless homicide, and consider whether the evidence supported a charge thereof. This argument is without merit and requires no further discussion.

Finally, Appellant contends that since this case generated extensive media cover-age, there should have been a "cooling off" period before the grand jury convened. Actually, the immediacy of the deliberations and indictment may have prevented grand jurors from obtaining additional information about the murder. Had the deliberations been delayed, exposure to additional media coverage would have been certain. Appellant was not prejudiced by the grand jury proceedings, nor was the grand jury deprived of its unbiased judgment due to the immediacy of the proceedings. *Baker, supra.*

### 3. *Judicial Recusal*

Following the indictment, defense counsel filed a motion requesting appointment of a special judge from outside of Jefferson County. Appellant alleged that no Jefferson Circuit Judge could be fair and impartial because a close relationship existed between the Jefferson County Sheriff's Department and the judiciary. The trial court denied the motion and this Court subsequently ruled that there were insufficient grounds to appoint a special judge.

KRS 26A.015(2) requires recusal when a judge has "personal bias or prejudice concerning a party ... [,]" or "has knowledge of any other circumstances in which his impartiality might reasonably be questioned." KRS 26A.015(2)(a) and (e); *see* SCR 4.300, Canon 3C(1). The burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts "of a character calculated seriously to impair the judge's impartiality and sway his judgment." *Foster v. Commonwealth*, Ky., 348 S.W.2d 759, 760 (1961), *cert. denied*, 368 U.S. 993, 82 S.Ct. 613, 7 L.Ed.2d 530 (1962); *see also Johnson v. Ducobu*, Ky., 258 S.W.2d 509 (1953). The mere belief that the judge will not afford a fair and impartial trial is not sufficient grounds for recusal. *Webb v.*

*Commonwealth,* Ky., 904 S.W.2d 226 (1995). Appellant, in this matter, has failed to meet the requisite burden.

Appellant cites to various instances, especially during motion hours, which he believes demonstrate the trial judge's prejudice against him. However, the record reveals that the trial court's exasperation at times was due to last minute filings of voluminous and often duplicative motions by the defense. In fact, the trial judge did comment at one point that Appellant was "killing trees" with the flurry of motions. Appellant also cites to rulings by the trial court on evidentiary issues in favor of the Commonwealth as proof of prejudice and bias. We disagree. "Although the trial judge was not a textbook example of judicial patience, we find no violation of [Appellant's] rights." *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111 (1994). Appellant received a fair trial by a fair and impartial judge.

### 4. *Change of Venue*

On the day before the October 21, 1997, pretrial hearing, defense counsel filed a fifteen-page petition for a change of venue that included one hundred and sixteen pages of exhibits and affidavits. At the hearing, the Commonwealth objected on the grounds that it had not received the pleading until 5:00 p.m. on the day before the hearing and thus had not had time to review or respond to such. The trial court ruled that it would not consider the petition until such time as it could review the lengthy pleading and attachments. On October 23, 1997, the trial court denied the petition, stating that the issue could be reviewed, if necessary, following voir dire.

■ This Court has held that a petition for a change of venue filed two days prior to trial, where the defendant was well aware of the pretrial publicity, was insufficient notice. *Thompson v. Common-*

*wealth,* Ky., 862 S.W.2d 871 (1993). Here, the trial court set the original November 4, 1997, trial date in April 1997. As Appellant has previously alleged that the extensive publicity tainted the grand jury proceedings, he certainly cannot deny that he was fully aware of that publicity long before the petition for a change of venue was filed. Moreover, it is unjustified to claim error in the trial court's refusal to consider the petition at the October 21, 1997, hearing in light of the fact that it was filed the day before. Had the trial court ruled on the issue at the hearing, Appellant would have a basis to argue that the trial court could not have given due consideration to such a volume of documents in only one day.

■ Furthermore, the trial court did not abuse its discretion in denying the petition on the merits. The right to a trial by jury guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. It is readily acknowledged, however, that wide discretion is, and should be, vested in the trial court when determining a change of venue question. *Jacobs v. Commonwealth,* Ky., 870 S.W.2d 412 (1994). Great weight is given to the trial court's decision because the judge is present in the county and is presumed to know the situation. *Nickell v. Commonwealth,* Ky., 371 S.W.2d 849 (1963). "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384, 387 (1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986), *habeas granted, in part, on other grounds, Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991); *see also Foster v. Commonwealth,* Ky., 827 S.W.2d 670 (1991), *cert. denied,*

506 U.S. 921, 113 S.Ct. 337, 121 L.Ed.2d 254 (1992). Further:

> [T] mere fact that jurors may have heard, talked or read about a case does not require a change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant. . . . Prejudice must be shown unless it may clearly be implied in a given case from the totality of the circumstances.

*Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713, 716 (1991); *see also Hodge v. Commonwealth*, Ky., 17 S.W.3d 824 (2000), *cert. denied*, 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000).

 The voir dire examination in this case reveals that although many jurors had heard about Deputy Hans' murder, most knew little more than what was read to them from the indictment. It is significant that of the 95 jurors questioned, only 38, or 40%, were excused based on opinions of guilt, excess knowledge of the facts, or refusal to consider the death penalty. This Court has upheld a death penalty conviction where over 50% of the panel was excused. *McQueen v. Commonwealth*, Ky., 721 S.W.2d 694 (1986), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). Contrary to Appellant's assertion, this case does not rise to the level of *Jacobs, supra*, in which 112 out of 153 jurors were excused based on preconceived notions of guilt, and of the 38 jurors accepted by the court, 19 had opinions of guilt, 4 of whom ultimately sat on the jury that convicted the defendant. *Id.* at 415. None of the jurors who sat on the panel in this case expressed preconceived notions of Appellant's guilt. We simply do not find that Appellant was prejudiced by the trial court's refusal to grant a change of venue.

### 5. *Pro Se Motion for Substitution of Counsel*

 Appellant's argument that the trial court erred in failing to hold a hearing on his motion for a substitution of counsel is not only unpreserved, but also unpersuasive. Four days prior to trial, Appellant filed a *pro se* motion for a substitution of counsel on the grounds that defense counsel was overworked on other cases and that a conflict had developed between counsel and Appellant regarding his defense. The trial court did, in fact, hold a hearing at which time defense counsel stated that Appellant wished to "remand" his motion. The trial court inquired of Appellant as to whether that was his decision, to which Appellant responded in the affirmative. Thus, it was unnecessary for the trial court to inquire further as to the grounds for the motion.

## II. JURY ISSUES

### 1. *Excusals for Cause*

 The decision whether to excuse a juror for cause is a matter within the sound discretion of the trial court. If the trial court abuses its discretion by improperly failing to sustain a challenge for cause, it is reversible error because the defendant had to use a peremptory challenge and was thereby deprived of its use otherwise. *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252, 259 (1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564(1994). Individual voir dire was conducted in this case in an effort to insure that each prospective juror was able to consider the full range of penalties applicable to the crimes charged. Appellant contends that he was required to use peremptory challenges on five jurors who should have been excused for cause.

 Juror 313 stated that he believed in an "eye for an eye" philosophy, and that

death was the only appropriate sentence for an intentional killing. However, he concluded that he would follow the law and that death would not be his automatic vote without hearing the evidence at the guilt phase.

■ Juror 371 initially stated that she did not think she could consider intoxication as a mitigating factor, although she clearly admitted that if instructed to do so by the judge, she would comply.

■ Juror 323 informed the court that his father was a former police officer. However, he noted that he did not have any preference for police officers and that his family connection to the law enforcement profession would in no manner affect his ability to decide the case based on the evidence presented. He further commented that considering drugs and alcohol as mitigating factors would be difficult.

■ Juror 361 stated that he too believed that one who intentionally kills another should be put to death as well. However, he did state that he would consider the full range of penalties.

■ Juror 394 voiced concern about an unpleasant experience serving as a juror in 1981. Specifically, she felt that she had been coerced by the jury foreperson to acquit a defendant who later committed a murder. Neither Juror 394, nor any of the above-challenged jurors, expressed any opinion as to the guilt of Appellant or prejudged beliefs about the case.

■ The trial court has the duty to evaluate the answers of prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law. We are guided by our decision in *Mabe v. Commonwealth,* Ky., 884 S.W.2d 668, 671 (1994), in which we stated:

Voir dire examination occurs when a prospective juror quite possibly has little

or no information about the facts of the case and only the most vague idea as to the applicable law. At such time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment. Similarly, many citizens are astounded to learn that being under the influence of drugs or alcohol may be considered by them as factors mitigating the punishment which should be imposed. Predictably, when asked whether they believe being under the influence should mitigate punishment, the answer is often in the negative. A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.

The record in this case reveals a thorough voir dire examination by the trial court and counsel. Giving due deference to the opportunity of the trial court to observe the demeanor of the prospective jurors and understand the substance of their answers to voir dire questions, we find no error.

■ Appellant also attacks the striking for cause of two prospective jurors because of their views on imposing the death penalty. Juror 354 revealed that she had significant reservations about the death penalty, and stated that it would really bother her to consider such punishment. Juror 400 also voiced a problem with the death penalty and stated that he would not want to

be placed in the position of having to consider it as a punishment. The trial judge correctly excused both jurors. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Tamme, supra.*

### 2. *Peremptory Strikes*

■ Appellant's contention that the trial court's allocation of peremptory strikes was erroneous is without merit. Appellant's interpretation of RCr 9.40 is incorrect. The language of RCr 9.40(2) provides that if alternate jurors are to be seated, the number of challenges for "each side and each defendant shall be increased by one." Contrary to Appellant's interpretation, in a case where there is only one defendant, such as is present here, the defense "side" and the "defendant" are one and the same. *See Springer v. Commonwealth*, Ky., 998 S.W.2d 439 (1999). Appellant was not entitled to two additional peremptory challenges.

■ Appellant also contends that the number of peremptory challenges as allocated in RCr 9.40 is inadequate in capital cases, and that the trial court should have granted his request for twenty challenges. Whether to grant additional peremptory challenges is clearly within the discretion of the trial court. *Brewster v. Commonwealth*, Ky., 568 S.W.2d 232 (1978); *Turpin v. Commonwealth*, Ky., 780 S.W.2d 619 (1989), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1530, 108 L.Ed.2d 769 (1990). Neither the fact that this was a publicized case nor that it was a capital case automatically entitled Appellant to additional challenges. We discern no abuse of discretion in the trial court's ruling.

### III. WITNESS ISSUES

### 1. *Testimony of Steve Porter*

■ Prior to trial, the defense learned that Steve Porter, a witness to Deputy Hans' murder, was receiving Social Security Income (SSI) benefits. Appellant's counsel asked the Social Security Administration the reason for the benefits and was allegedly told that Porter received benefits for a mental disability. Pursuant to *Eldred v. Commonwealth*, Ky., 906 S.W.2d 694 (1994), *cert. denied*, 516 U.S. 1154, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996), the trial court ordered a hearing and directed Porter to produce any medical records in his possession.

At the hearing, the Commonwealth stated that Porter did not, in fact, have any personal records relating to his SSI benefits. During questioning, Porter stated that he was receiving benefits for obesity, that he was not under the care of any physician, and that he had been drawing the benefits for approximately three years. Defense counsel moved that Porter be required to sign a release so that his records could be obtained from the Social Security Administration. The trial court denied the motion. Further, at the beginning of trial, the court denied a defense motion in limine to prohibit Porter from testifying.

Appellant argues that there was credible evidence that Porter was incompetent to testify, yet fails to point to any specific proof of such. At no time did counsel produce an affidavit documenting specifically who in the public defender's office spoke with the Social Security Administration, and which individual at that agency informed counsel that Porter was receiving benefits for a mental disability. A bald assertion that "someone spoke with someone who said ..." is not sufficient to warrant an intrusion into a witness' personal medical history.

Appellant is certainly correct that the trial court could have ordered an *in camera* inspection of Porter's records to protect his privacy. However, defense coun-

sel failed to produce "articulable evidence that raise[d] a reasonable inquiry of [Porter's] mental health history." *Eldred, supra.* This Court has consistently held that a trial court does not abuse its discretion in refusing to permit a witness to be cross-examined about his or her mental history where there is no substantial basis for the inquiry. *Id., Commonwealth v. Huber,* Ky., 711 S.W.2d 490 (1986).

■ Appellant also takes issue with the trial court's refusal to allow the testimony of Jason Porter, Steve Porter's brother, concerning Steve Porter's mental history, to impeach his credibility. Jason Porter testified by avowal that Steve Porter had been under psychiatric care. Nonetheless, we are compelled to hold, as we did with Porter's SSI records, that defense counsel failed to establish a reasonable basis for Jason Porter's testimony. The trial court did not abuse its discretion in refusing the testimony of Jason Porter.

## 2. *Rebuttal Testimony*

■ There was no error in admitting the rebuttal testimony of Kevin "County" Powell and Selesia Hamilton. Powell testified that he was with Appellant on the morning of the murder and that the two had taken LSD. Powell later wrote to Appellant saying he was willing to testify that they "were all f___ up on acid." Powell testified in rebuttal that Appellant later sent him a letter telling him exactly how to testify, and that some of the testimony Appellant requested was not true. Hamilton testified in rebuttal that she was with Appellant and Powell when Deputy Hans arrived at Appellant's home. She stated that when Appellant saw the police cruiser, he said, "A f___ cop, a cop. I'll kill this motherf___."

■ The admission of rebuttal evidence is largely a matter of judicial discretion. RCr 9.42. Since Appellant admitted

that he was under the influence of drugs at the time he murdered Deputy Hans, we fail to discern the prejudice of Powell's testimony. Furthermore, Hamilton's testimony was clearly to rebut Appellant's contention that the shooting was accidental. Simply because the trial court denied her testimony during the Commonwealth's case in chief because it was somewhat suspect and largely hearsay, it was within the court's discretion to permit her to testify in rebuttal.

## 3. *Lay Opinion Testimony of Shawna Gritton*

■ Appellant argues that his girlfriend, Shawna Gritton, should have been permitted to testify concerning his appearance when she viewed him on television the day of the murder. By avowal, Gritton stated that when she saw Appellant on the television, presumably during a news story covering the murder, she thought he looked "different" and was acting "real weird." The defense sought to introduce this testimony to demonstrate that Appellant was high on LSD and lacked the requisite intent for murder.

■ KRE 701, Opinion testimony by lay witnesses, provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions and inferences is limited to those opinions or inferences which are:

(a) Rationally based on the perception of the witness; and

(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In this case, Gritton's observation of Appellant on television rather than in person was not germane to the question of admissibility. She certainly could have expressed the opinion that Appellant looked

different than he normally looked. Notwithstanding, we fail to perceive prejudice from the exclusion of Gritton's opinion, and thus conclude that any error in denying her testimony was harmless. RCr 9.24. Unquestionably, an individual who has just murdered another is going to look, and probably act, "different." Merely because Appellant exhibited facial expressions that Gritton had not previously observed does not prove that he was high on LSD. Gritton's testimony simply would not have been helpful to a determination of any fact in issue.

### 4. *Dr. Evans' Testimony*

■ Defense expert, toxicologist Dr. Michael Evans, testified that samples of Appellant's urine taken the day after the murder contained traces of an ethyltriptomine-like substance, which is similar to a compound sometimes found in LSD. Moreover, Dr. Evans testified about the general effects of LSD and how it affects the brain and nervous system. However, Dr. Evans was not permitted to express an opinion as to whether he believed Appellant was on LSD at the time of Deputy Hans' murder.

Dr. Evans was retained as an expert to provide medical testimony as to whether the tests his office performed found any hallucinogens in the samples taken from Appellant. While Dr. Evans was qualified to give testimony on the chemical composition of the samples, he was not qualified to provide an opinion as to whether Appellant's actions on the day of the murder were consistent with someone who was affected by LSD. During avowal testimony, Dr. Evans stated that his opinion was based on his review of the testimony of defense witnesses, the crime scene video depicting Appellant's struggle with officers as he was being arrested, and his interview with Appellant. Dr. Evans conceded that he had not heard the testimony of any of the witnesses for the Commonwealth, and

had not even met Appellant until the night before he was to provide his expert testimony at trial. As such, any opinion Dr. Evans could have rendered would have arguably been based on the self-serving statements of Appellant and the statements of defense witnesses who were clearly sympathetic to Appellant. *See Sanborn v. Commonwealth*, Ky., 892 S.W.2d 542, 551 (1994), *cert. denied*, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995).

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise." KRE 702. An expert can base his opinion on the testimony of other witnesses, or even hearsay, if he states that it is the basis for the opinion and that it is the type of information upon which experts in the field reasonably rely. KRE 703(a). The situation presented in *Sanborn, supra*, is distinguishable from this case in that the trial court in *Sanborn* precluded a witness from repeating the defendant's out-of-court identification of the triggering event, which was the basis of his claim of extreme emotional disturbance, since there was absolutely no other evidence to support a triggering event and the defendant's statement was not subject to cross-examination.

Notwithstanding, we are of the opinion that Dr. Evan's testimony would, at best, have been of questionable assistance to the jury since his tests did not reveal LSD in Appellant's urine, and since there was no evidence presented from other witnesses as to the amount of LSD ingested by Appellant on the day of the murder. In other words, Dr. Evan's opinion could not have helped the jurors to understand the evidence presented and could not have assisted them in determining whether Appel-

lant was, in fact, affected by LSD at the time he murdered Deputy Hans. As such, the trial court properly limited his testimony to the general effects of the drug.

### 5. Testimony of Ernest Bishop

Appellant's argument that he was prohibited from cross-examining Bishop, a jailhouse informant, is without merit. Appellant was able to question Bishop concerning the statements allegedly made to him by Appellant, his prior criminal history, and his plea negotiation in exchange for his testimony against Appellant. Although Bishop's testimony regarding what Appellant told him happened on the day of the murder was contrary to the testimony of other witnesses, the jury was more than capable of assessing Bishop's credibility and deciding whether or not he was telling the truth. Moreover, we decline Appellant's invitation to establish rigorous standards for the testimony of jailhouse snitches. Sufficient safeguards are already contained in our civil and criminal rules. No error occurred.

We also find no error in the trial court's denial of Appellant's motion to suppress Bishop's testimony on the grounds that Appellant's Sixth Amendment rights were violated when Bishop acted as governmental agent in soliciting statements from Appellant. There is absolutely no evidence that the prosecutor or any other agent of the Commonwealth induced Bishop to talk to Appellant or listen to his bragging about the murder of Deputy Hans. The testimony at trial indicated that Appellant had volunteered all information to Bishop. While Bishop was certainly familiar with the penal system, and had evidently acted as a jailhouse informant in the past, he was not acting as a governmental agent and did not induce Appellant to incriminate himself.

### 6. Testimony of Myrl Reed

Reed testified at trial that when he heard about the murder on television, he immediately drove to the scene and witnessed police struggling with Appellant in an attempt to subdue and handcuff him. On cross-examination, defense counsel asked Reed whether he had been interviewed by Rose Nunn, an investigator with the Louisville Public Defender's Office, about a month after the murder. Reed stated that he did not recall such interview. Defense counsel thereafter sought to introduce Nunn's report as a business record under KRE 803(6) through the testimony of another investigator.[1] The trial court sustained the Commonwealth's objection. We, too, agree that the report does not qualify under the 803(6) as an exception to the hearsay rule. See Prater v. Cabinet for Human Resources, Ky., 954 S.W.2d 954 (1997). Moreover, the rule contains a disclaimer that admission can be denied if "the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." KRE 803(6). Inasmuch as Nunn's report was prepared in anticipation of Appellant's trial, and more specifically in preparation of Appellant's defense, the trial court did not abuse its discretion in excluding it.

### 7. Testimony of David Hans

We find no merit in Appellant's contention that he was unduly prejudiced by Deputy Hans' son, David, who is also a police officer, testifying in uniform. The jury was aware that Deputy Hans was a police officer and was informed that his son was an officer as well. David did not render an opinion of guilt or serve as an expert in any manner. Cf Brown v. Commonwealth, Ky., 983 S.W.2d 513 (1999).

1. Nunn had since moved to Florida and was unavailable at trial.

David testified for approximately one minute in the guilt phase, during which time he identified himself as the victim's son, identified a picture of the victim and the victim's police badge, and informed the jury about the victim's family. No error occurred.

## IV. EVIDENTIARY ISSUES

### 1. *Photographs of crime scene and victim*

The Commonwealth introduced two photographs of Deputy Hans' police cruiser that showed a blood trail where his body had been removed from the vehicle. Appellant argues that the photographs were not accurate depictions of the crime scene and were thus prejudicial. We disagree. There would have been blood present in the vehicle even if the removal of Hans' body had not left a trail. His position in the vehicle was not in dispute, and it was evident from the photographs that the marks were caused by his removal.

Appellant also objects to the introduction of four autopsy photographs during the testimony of Dr. George Nichols. Dr. Nichols testified that the photographs depicted the position of the gun at the time it was fired, where the bullet entered Han's body, and the path that it traveled. Appellant is incorrect in stating that simply because the photographs were inflammatory that they were inadmissible. The photographs were an accurate depiction of Deputy Hans' injuries and aided Dr. Nichols' testimony. "[T]he general rule is that relevant photographs are not inadmissible just because they are gruesome and the crime they depict is heinous." *Eldred, supra,* at 704; *Clark v. Commonwealth,* Ky., 833 S.W.2d 793 (1991).

### 2. *Directed Verdicts*

Appellant argues that the trial court erred in not granting a directed ver-

dict on all charges since the Commonwealth's evidence lacked the "atmosphere of verisimilitude" and "fitness to produce a conviction." Appellant emphasizes the fact that the Commonwealth had the burden of proving intent, which he maintains it failed to do. However, intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct, and a person's state of mind may be inferred from actions preceding and following the charged offense. *Hudson v. Commonwealth,* Ky., 979 S.W.2d 106 (1998); *Parker v. Commonwealth,* Ky., 952 S.W.2d 209 (1997), *cert. denied,* 522 U.S. 1122, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998). After viewing the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found beyond a reasonable doubt that Appellant intended to commit the crimes for which he was charged. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### 3. *Humanization of Victims*

Appellant claims the trial court erred in allowing Deputy Hans' son to testify in uniform and show the jury a picture of his father, and in allowing Colonel Jim Cain, Deputy Hans' commanding officer, to testify as to Deputy Hans' dedication to his profession and peers. Appellant argues that such testimony constituted prejudicial evidence that Deputy Hans was "a family man, a highly dedicated officer, very caring, well-respected, helpful, and treated others with respect and dignity." While those attributes may well be accurate, we characterize the testimony as nothing more than showing that Deputy Hans was a human being.

A murder victim can be identified as more than a naked statistic, and state-

ments identifying the victims as individual human beings with personalities and activities does not unduly prejudice the defendant or inflame the jury. Just as the jury visually observed the appellant in the courtroom, the jury may receive an adequate word description of the victim as long as the victim is not glorified or enlarged.

*Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 302–303 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997); *see also Hodge, supra.* The evidence was not unduly prejudicial.

## V. INSTRUCTIONS

1. *Guilt Phase.*

■ Appellant contends that he was entitled to both an intoxication defense instruction, which he was given, and an Extreme Emotional Disturbance instruction. Appellant claims there was evidence that, unbeknownst to him, someone slipped LSD into his drink during the early morning hours prior to the murder, and that the LSD triggered a state of mind so enraged, inflamed or disturbed as to overcome his judgment and cause him to act under the force of EED. *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987).

■ There was absolutely no evidence presented that Appellant was unknowingly "slipped" the LSD. Notwithstanding, there was also no evidence demonstrating that Appellant acted under EED at the time he murdered Deputy Hans. Appellant has mischaracterized the law regarding EED. *McClellan, supra.* A defendant is not entitled to an EED instruction merely because he exhibits behavior resulting from the effects of substance abuse. *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 179 (1993), *cert. denied,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994). The trial

court correctly ruled that the intoxication defense instruction covered the fact situation presented.

■ Appellant further argues that EED is an element of murder and that the Commonwealth was required to prove the absence thereof. We have recently held to the contrary in *Spears v. Commonwealth,* Ky., 30 S.W.3d 152 (2000). While the Commonwealth is required to prove every element of murder beyond a reasonable doubt, it need not affirmatively disprove EED unless the evidence of such is so overwhelming that it necessitates acquittal on the murder charge. *Id.* at 154; KRS 500.070; *see also Wellman v. Commonwealth,* Ky., 694 S.W.2d 696, 697 (1985).

■ Also, Appellant was not entitled to a self-defense instruction on the assault charges. Given that he had just murdered a police officer, his argument that he made no threatening gestures prior to being tackled by other officers is somewhat disingenuous. Testimony clearly established that restraining Appellant required several police officers. Moreover, Appellant even managed to unholster another officer's weapon during the struggle. Police were certainly justified in using the force that they did. There is no right to use self-defense during an arrest. *Baze v. Commonwealth,* Ky., 965 S.W.2d 817 (1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998).

■ The trial court properly refused to instruct the jury on the definition and meaning of reasonable doubt. RCr 9.56; *Commonwealth v. Callahan,* Ky., 675 S.W.2d 391 (1984). Appellant was not deprived of his constitutional right to instructions on lesser-included offenses supported by the evidence simply because the instructions required the jury to acquit Appellant of the greater charges in order to

consider the lesser-included offenses. Appellant has cited no authority, and we find none, for the proposition that the trial court was required to instruct on a jailhouse informant's benefit from testifying. The jury was instructed to base its decision on the evidence alone and did not need to be instructed on the influence of "passion and prejudice." Finally, the trial court informed the jurors that the first phase of trial was to determine guilt and then a second phase would consider punishment. No additional admonition or instruction was required.

We conclude that the guilt phase instructions were thorough and complete.

### 2. Penalty Phase

■■■ Appellant claims multiple errors, most of which are standard death penalty arguments, in the penalty phase instructions. We find no merit in any of these claims. This Court has held repeatedly that there is no requirement that a jury be specifically instructed that its findings on mitigation are not required to be unanimous. *Bowling, supra*, 873 S.W.2d at 180; *Tamme, supra*. Nor is there any constitutional requirement that the trial court define mitigating circumstances or explain their function. "Jury instructions at the sentence stage of a capital trial need not include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances." *Id.*, 973 S.W.2d at 38 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1528 (11th Cir.1995), *cert. denied*, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995)).

■■■ The jury was instructed in a catch-all provision to consider any and all mitigating factors which it found relevant. There is no requirement to enumerate each non-statutory factor in detail. *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996), *cert. denied*, 522 U.S. 837, 118

S.Ct. 110, 139 L.Ed.2d 63 (1997); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). There is no evidence to suggest that the jury did not consider Appellant's childhood upbringing, the love of his friends and family, and his three young children. Moreover, the trial court did not err in refusing to instruct the jury that the standard of proof for mitigating circumstances is a preponderance of the evidence. "Since a jury is not required to make findings with regards to mitigators, but only to consider them, there is no need to define the standard of proof." *Tamme, supra*, at 38. Nor is there a requirement to instruct the jury on "residual doubt" as to mitigating factors. *Bussell, supra.*

Appellant complains that he was entitled to an instruction on the statutory mitigator of extreme emotional disturbance. KRS 532.025(2)(b)(2). Appellant contends that his "unknowing" ingestion of LSD precipitated a "bad trip" which triggered a state of mind so enraged, inflamed or disturbed as to overcome his judgment. As we have already stated herein, not only is this theory incredulous, but it is simply not the law with respect to EED. Appellant was not entitled to either an instruction on the defense of EED or the mitigator of such. Nor are we persuaded that he was prejudiced by the location of the intoxication mitigator. The language of the instruction is essentially identical to that contained in KRS 532.025(2)(b)(7), and conforms to the mitigating circumstances instruction contained in Cooper, *Kentucky Instructions to Juries*, § 12.05, at 734 (4th ed. Anderson 1999).

■■■ Appellant was not entitled to an instruction on his eligibility for parole. *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 164 (1995), *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). Nor

was the trial court required to inform the jury that if it returned a sentence of death, Appellant would indeed be electrocuted. We also reject Appellant's claim that the jury was required to make specific findings of mitigating circumstances. *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985), *cert. denied,* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986).

Finally, Appellant argues that the penalty phase verdict forms were flawed because they required the jury to sentence him to death or life without parole for twenty-five years upon the finding of an aggravating circumstance. Again, this is a claim which has been previously rejected by this Court. *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872 (1992), *cert. denied,* 507 U.S. 1034, 113 S.Ct. 1857, 123 L.Ed.2d 479 (1993), *overruled, in part, St. Clair v. Roark,* Ky., 10 S.W.3d 482 (1999). The verdict forms, which are identical to those approved in Cooper, *supra,* § 12.10, at 742–45, are clear that the jury is not required to find an aggravating circumstance unless it intends to impose the death penalty or life without parole for twenty-five years. Moreover, the "Authorized Sentences" instruction clarifies the options to the jury and specifically states, "The finding of an aggravating circumstance ... does not require the imposition of the death penalty or life in prison without benefit of parole for twenty-five years." There was no error in the penalty phase instructions.

## VI. PROSECUTORIAL MISCONDUCT

Appellant alleges sixty-one instances of prosecutorial misconduct "beginning with the first utterances of the Commonwealth's Attorney and continuing until his last breath at closing argument in the penalty phase of trial." *Perdue, supra,* at 154. Many of the complaints are repetitive of each other, or of other issues raised in this appeal. Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. *Partin v. Commonwealth,* Ky., 918 S.W.2d 219 (1996). In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair. *Summitt v. Bordenkircher,* 608 F.2d 247 (6th Cir. 1979), *Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488 (1995).

Appellant's first claim of misconduct concerns the cross-examination of his brother, John Stopher, about Appellant's prior arrest for assaulting a police officer. In fact, such charge had been dismissed. However, the prosecutor had the documentation indicating that Appellant had been arrested for such offense, and we conclude that the question was asked in good faith. Appellant also takes issue with what he considers to be other injections of prior bad acts into evidence through the testimony of Jennifer McGiveny, Shawna Gritton, and Tina Anderson. However, a review of the witnesses' testimony reveals that the prosecutor was merely impeaching statements that Appellant had never been involved with drugs and could not intentionally commit murder. No prosecutorial misconduct in these instances occurred.

Appellant argues that the prosecution withheld the tape recorded plea negotiations of witness Ernest Bishop. Defense counsel was fully informed of the terms of the plea agreement and even subpoenaed Bishop's public defender to inquire about the parameters of such. No misconduct on the part of the Commonwealth was demonstrated.

Appellant's numerous claims of misconduct occurring during opening and closing arguments lack merit. We have consistently held that opening and closing arguments are not evidence and prosecu-

tors have a wide latitude during both. "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of the defense position." *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 412 (1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). While Appellant may find the prosecutor's characterization of his defense theory as "stupid" rather harsh, it did not exceed the proper bounds of closing argument and did not affect the outcome of the trial. Nor do we find that the prosecutor misstated the evidence during closing argument. "The alleged misstatements are more accurately characterized as interpretations of the evidence." *Tamme, supra*, at 39.

 Appellant raises several claims of misconduct during the penalty phase as well. First, Appellant claims he was prejudiced because Officer Roehrs sat, in uniform, on the bench behind the Commonwealth's table during the penalty phase. Since it is undisputed that the courtroom was at capacity during the entire trial, and that uniformed officers were present throughout, we fail to discern any prejudice. Next, Appellant contends that the prosecutor improperly cross-examined Appellant's brother regarding Appellant's involvement in gang activity. The trial court ruled that the defense had opened the door to this line of questioning and that the prosecutor was permitted to inquire about Appellant's involvement. As such, the prosecutor's question cannot be deemed misconduct. Finally, Appellant maintains that the prosecution violated the "Golden Rule" during the penalty phase closing argument. We disagree. In *Dean v. Commonwealth*, Ky., 777 S.W.2d 900 (1989), we stated that a prosecutor may not cajole or coerce a jury to reach a verdict. At no time did the prosecutor ask the jurors to place themselves in the shoes of the victim, nor did he glorify the victim.

 The remainder of Appellant's claims of misconduct have been reviewed and found to be unpreserved, insubstantial or harmless. We note that several claims were merely unpreserved issues characterized as prosecutorial misconduct for the purpose of raising them on appeal. Issues involving the admission of evidence or testimony, when ruled upon by the trial court, do not constitute prosecutorial misconduct. In fact, in *Davis v. Commonwealth*, Ky., 967 S.W.2d 574, 579 (1998), this Court recently explained that despite the trend to classify many unpreserved issues as prosecutorial misconduct, such actually only occurs when a conviction is obtained by the knowing use of false evidence.

In evaluating the overall fairness of the trial, we cannot conclude that the conduct of the prosecutor was so serious as to render the entire trial fundamentally unfair. *Chumbler, supra*. The prosecutorial excess, if there was any, was non-prejudicial.

## VII. MISCELLANEOUS ISSUES

### 1. *Residual Doubt*

 Citing *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), Appellant contends that even if the evidence was sufficient to support his conviction, his death sentence violates the Eighth Amendment of the United States Constitution since the evidence fails to foreclose all doubt about his guilt of intentional murder. "As thus presented, the concept of 'residual doubt' is akin to a lesser included version of jury nullification. It plays no role in jury instructions, *Bussell v. Commonwealth*, [*supra*], or in appellate review." *Tamme, supra*, at 40.

## 2. Constitutionality of death sentence

"Appellant's arguments that the death penalty is discriminatory and arbitrary, and that our statutory scheme does not provide constitutionally adequate guidance to capital sentencing juries, have been raised, considered and rejected by this Court on numerous occasions." *Hodge, supra,* at 854; e.g., *Tamme, supra,* at 40–41; *Bowling, supra,* 942 S.W.2d at 306; *Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 890 (1996), *cert. denied,* 522 U.S. 893, 118 S.Ct. 234, 139 L.Ed.2d 165 (1997); *Bussell, supra,* at 115; *Sanders, supra,* at 683. Our views with respect to those arguments remain unchanged.

▮ Nor are we persuaded that a trial judge is constitutionally required to instruct the jury that aggravating circumstances must outweigh mitigating circumstances. *Bowling, supra,* 942 S.W.2d at 306; *Sanders, supra,* at 682–83; *Ice v. Commonwealth,* Ky., 667 S.W.2d 671(1984), cert. denied, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984); *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980). In any event, we certainly do not find that the mitigating circumstances outweighed the aggravating circumstances in this case.

## 3. Other issues

▮ The use of a video tape record did not violate Appellant's equal protection rights and does not constitute reversible error. Appellant fails to cite to a single item of evidence which is not in the appellate record which would have been included had a transcription method been employed. Appellant demonstrates no prejudice as a result of the video record and we do not agree that such has denied him effective appellate counsel. *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 495 (1999), *cert. denied,* 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000). Fail-

ure to provide access to data collected by this Court pursuant to KRS 532.075(6) did not deny Appellant due process of law. *Id.; Harper v. Commonwealth,* Ky., 694 S.W.2d 665, 671 (1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). It is not unconstitutional to "death qualify" a jury. *Mills, supra; Wilson, supra,* at 890. Due process was not violated since the trial judge played a separate and distinct role as contemplated by KRS 532.025 and KRS 532.030. *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986). The trial judge is not required to articulate that role.

## 4. Cumulative Error

Appellant received a fundamentally fair trial and we find insufficient instances of harmless error to create a cumulative effect which would warrant reversal for a new trial. *Tamme, supra; compare Funk v. Commonwealth,* Ky.; 842 S.W.2d 476 (1992).

## VIII. PROPORTIONALITY REVIEW

▮ Pursuant to KRS 532.075, we have reviewed the death sentence imposed herein and conclude that it was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Furthermore, the evidence supports the finding of an aggravating circumstance. We have also considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, as required by statute, and have therefore considered all circumstances of the crimes committed here and all of the evidence surrounding Appellant and his background. The information used in considering this penalty has been compiled in accordance with KRS 532.075(6)(a), (b), and (c). We have considered all of the cases in

which the death penalty was imposed since 1970, considering both the crime and the defendant. Similar cases have been previously recited by this Court in a number of decisions. *Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989), provides a comprehensive list which is incorporated herein by reference. We have particularly considered those in which a defendant was sentenced to death for intentional murders unaccompanied by other criminal behavior directed toward the victims, e.g., burglary, robbery, rape, etc., viz: *Mills, supra; Foley, supra; Bowling, supra,* 873 S.W.2d 175; *Haight, supra; Epperson v. Commonwealth,* Ky., 809 S.W.2d 835 (1990), *cert. denied,* 502 U.S. 1065, 112 S.Ct. 955, 117 L.Ed.2d 122 (1992); *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988); *Slaughter, supra; Bevins v. Commonwealth,* Ky., 712 S.W.2d 932 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1010 (1987); *Harper, supra;* and *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). On the basis of this review, we have determined that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.

The judgment and sentence of the Jefferson Circuit Court are affirmed.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, and WINTERSHEIMER, J.J. concur.

KELLER, J., dissents in a separate opinion in which STUMBO, J., joins.

1. *See Thomas v. Commonwealth,* Ky., 864 S.W.2d 252 (1993), *cert. denied,* 510 U.S.

KELLER, Justice, dissenting.

I dissent from Section II(1) of the majority opinion concerning the trial court's rulings on Stopher's challenges for cause and write separately regarding Section III(4)'s conclusions regarding Dr. Evans's testimony. I dissent from the majority's result because I believe the trial court abused its discretion when it denied Stopher's challenge for cause to Juror # 361. Under this Court's existing jurisprudence, the trial court's improper failure to sustain a challenge for cause is reversible error because the erroneous ruling deprives the defendant of the use of one of his or her peremptory challenges.[1] Although I will articulate within this opinion the reasons I believe the Court should reconsider this holding, the Commonwealth does not dispute its viability, and I must conform to this precedent until this Court chooses to correct it.

## I(A)—FAILURE TO SUSTAIN STOPHER'S CHALLENGE TO JUROR # 361

In my opinion, Juror # 361's responses to the questions asked of him by the trial court ("TC"), Commonwealth's Attorney ("Com."), and Stopher's defense counsel ("Def.") during individual voir dire clearly demonstrated that he could not consider the full range of penalties:

> TC: Now, if the jury that sits in this case, after hearing all the evidence in the case, were to find the defendant guilty of intentional murder, and, if the jury were to also find certain aggravating circumstances to exist, then the jury would be asked to select and assign the appropriate punishment for that offense. And it would have the option of assessing that punishment

1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

from one of the following ranges of penalty that I will describe to you. The jury could sentence the defendant to a period of confinement of no less than twenty years in the penitentiary or any term of years in excess of twenty years up to and including life imprisonment. Or the jury could sentence the defendant to life imprisonment without the possibility of parole for twenty-five years. Or the jury could sentence the defendant to death. Now, again, if you were one of those jurors and the jury did, as indicated, find the defendant guilty of intentional murder, after that verdict were determined by the jury and announced here in the open court, I would be advising the jury that there would be a second phase of the trial. That second phase of the trial would be a sentencing phase. At that time, the jury would then possibly hear additional evidence presented to it which would be focused exclusively on the sentencing aspect. The jury, after hearing that information, would then be asked to return to the jury room and then to deliberate and come up with the appropriate sentence. Now, this time, the second time that the jury goes back to deliberate, they now have and can consider all the evidence that they heard in the first phase of the trial as well as all the evidence, if any, that they heard in the second phase of the trial. Now, my question to you is, if you were a member of that jury, could you, in affixing the appropriate punishment, consider the entire range of sentences that I've just told you along with all the facts that have been presented in the case and then come up with a fair and appropriate sentence?

\# 361: I believe so. Yes, I believe I could.

The Commonwealth's voir dire then established that Juror # 361 had no moral, ethical, or religious objections to the death penalty and that he considered the imposition of the death penalty to be a "fit, moral, and proper" function of government. The Commonwealth then rephrased the trial court's inquiry:

> Com.: In a case involving a defendant who was found guilty of intentionally murdering a deputy sheriff while in the line of duty, would you be able to fairly consider the full range of penalties as described by the judge. In other words, twenty years to life, life without the possibility of parole for twenty-five years, up to and including the death penalty?

> \# 361: [Inaudible]

> Com.: You could? You could consider them all?

> \# 361: Yes, I could consider them all.

Voir dire examination by the defense then established that Juror # 361 believed that the death penalty serves a deterrent function ("With the death penalty, that's a good way to change people's minds, knowing if you're going to get the death penalty, not to commit the crimes in the first place—your life for another one.") After agreeing with defense counsel that people still commit murder despite the possibility of the death penalty, Juror # 361 admitted that he believed that the death penalty should be used more often. Further questioning raised serious doubts about Juror # 361's ability to consider the full range of penalties:

> Def.: Once a jury has found a person guilty of a crime beyond a reasonable doubt, is there any crime where, after being told what the range of penalties are, that you would exclude everything but the death penalty?

\# 361: I'm not understanding what you're asking.

Def.: In other words, if the judge said you could, let's say hypothetically, for this crime, the low end is twenty years in jail and the high end is the death penalty and you can consider anything in between. Is there any crime where, for you, we don't consider anything else but the death penalty—that crime's so bad that it's got to be a death case?

TC: In other words, you could not follow the court's instruction to consider the whole range of penalty. You would automatically just on the nature of the crime . . .

\# 361: OK, yeah, I believe if you kill somebody, it's possible you should be put to death, too.

Def.: Are you saying then, since this is a case where we have the death of a police officer, if the jury found Vincent Stopher guilty beyond a reasonable doubt of intentionally killing that police officer, that it's automatic he should receive the death penalty to the exclusion of any other punishment? You wouldn't consider anything else but a death penalty?

\# 361: Honestly, yeah. The death penalty I believe is what I would choose.

Def.: OK, if the judge said "you need to consider twenty years or life without parole for twenty or life or death penalty," you're not going to consider those, you're only going to consider the death penalty as being the appropriate one in this case, is that what you're saying?

\# 361: Yes.

The Commonwealth than asked the Court to again question the juror, and the Court again inquired:

TC: As indicated by Mr. Yustas [Stopher's trial counsel], if the jury, after hearing all the evidence as I mentioned to you earlier, were to find the defendant guilty of the intentional murder of a police officer in the performance of his duty, it would then be my duty to instruct the jury that they could consider the following punishments, and they're those along the lines I've just described to you—that you can consider any punishment of no less than twenty years imprisonment up to life imprisonment, or life imprisonment without the possibility of parole for twenty-five years, or death as a possible punishment. And in considering and discussing with your fellow jurors and deliberating, you would be asked and it would be part of my instructions that you take into consideration and factor into your judgment the matters that you heard in the initial phase of the trial as well as any matters that might be presented at that second phase of the trial. And, as indicated, the second phase of the trial would include information that might tend to even treat the matter more serious than you might have initially, if that's possible. Or, on the other hand, might present information that would tend to, while leave the matter quite serious, but tend to give you a more mitigating impression of the defendant—something extenuating or explanation, perhaps, not a defense, but at least let you know something about who this person is and sometimes that's considered to be matters which would tend to look at, direct your attention perhaps, towards a less serious sentence. It might not have that weight upon you or have that effect upon you, but, you know the juror is allowed and instructed to consider these matters. Now, if you were in that situation as a juror under

those circumstances, would you be able to go back with your fellow jurors and fully discuss and deliberate with them all the aspects of the case and all the possible punishments or would you, upon retiring to deliberate and decide sentence, just state "Nah, he killed a police officer, and death is the only sentence that I think is appropriate"?

# 361: I could probably weigh the difference, but, to me, it doesn't matter if it's a police officer or anybody. I mean, if you deliberately kill somebody, you deserve what you got coming.

TC: OK, and can you, however, personalize it? By that I mean—that's I take to be your general impression of anybody that takes a life of somebody unlawfully—but could you personalize it by, in a particular case, look at who's charged and who's been convicted and make a decision as to that individual based on the facts of that case, or would you tend to say "don't care who you are or what you're like or where you came from or anything, this is it"? Or could you consider personal aspects or aspects of the case itself?

# 361: Sure, I could consider it, yeah. But, I still, you know, the way I feel about it is, if you take a life—deliberately—how do you say it, an eye for an eye, a tooth for a tooth, that kind of deal. That's the way I feel about it.

TC: ·I understand the way you feel about it. I guess what I'm trying to distinguish and counsel are concerned is that might be your feeling, but if you are asked to sit as a juror on this case and take the oath to serve as a juror, could you follow the instructions of the court and consider all matters that are presented to you or would your personal feelings so drive you such that you would say "well, if we you found you guilty, then the only penalty that you're fit for is death" or could you consider other possible penalties depending on the facts of the particular case . . .

# 361: Sure, I could consider other possible penalties, yeah, I could, yeah, but I don't think I'm really understanding. You mean could I choose something besides the death penalty?

TC: Yes.

# 361: OK, sure, sure, I could.

TC: Let me ask it this way, and I'm being inartful, but let me ask you this. Can you conceive—I'll use your terminology—of, knowing that, in any intentional murder,[2] that the jury has the right under the law to sentence anywhere from twenty years up to and including death—all that range all the way from twenty years all the way up to death—knowing that that's what the law gives the jury the right to do, can you conceive of a factual situation, without telling us about it, a set of circumstances, where you could believe that a person could be sentenced to something other than death for the intentional murder of someone?

# 361: Sure, yes, I could.

The defense then questioned Juror # 361 concerning his ability to consider the minimum penalty of twenty years:

Def.: Can you conceive of a case where you have an intentional murder where the defendant gets twenty years?

---

2. Although the trial court's question appears to imply otherwise, a jury must find an aggravating circumstance before it may sentence a defendant to death or life without possibility of parole for twenty five years. KRS 532.025(3).

\# 361: I don't think it's right, but I can see that, yeah, but, like I say, when you kill somebody—

. . .

Def.: Can you conceive of yourself ever considering twenty years as a valid sentence in an intentional murder case?

\# 361: No.

The trial court initially withheld his ruling on Stopher's motion challenging Juror # 361 for cause, but later denied the challenge and decided that Juror # 361 could fulfill his duties as a juror despite his answers to the questions asked him regarding the death penalty. The trial court dismissed Juror # 361's answer to defense counsel's final question as "under the stark reality as presented—the killing of a police officer in the line of duty—that the twenty years did not make sense to him under those circumstances" and compared it to the situation addressed by this Court in *Mabe v. Commonwealth*.[3] Stopher used a peremptory challenge to remove Juror # 361.

In *Grooms v. Commonwealth*,[4] this Court held that "a juror should be excused for cause if he would be unable in·any case, no matter how extenuating the circumstances, to consider the imposition of the minimum penalty prescribed by law."[5]

Although reviewing courts must give due deference to trial court determinations,[6] we must not abdicate our responsibility to review those determinations for error. In my opinion, the trial court's decision that Juror # 361 could consider all possible penalties was clearly erroneous. While I am troubled by Juror # 361's invocation of the Old Testament "eye for an eye, tooth for a tooth" maxim, I find no margin for different interpretations of his response to the final question asked of him. Contrary to the trial court's characterization at the time of its ruling on the challenge for cause, defense counsel did not propose a stark hypothetical and ask Juror # 361 if he could consider the minimum sentence. Defense counsel asked if Juror # 361 could conceive of *any* intentional murder for which he could consider the minimum penalty, and Juror # 361 answered with an unequivocal "no." This was the last question asked of Juror # 361, and, in clear and unambiguous terms, it struck at the heart of the question before the trial court—could Juror # 361 set aside his personal convictions and consider *all* possible penalties. He clearly, loudly, and unequivocally answered "no."

Although the Commonwealth contends that Juror # 361 indicated elsewhere during his individual voir dire that he could follow the instructions of the trial court,

---

3. Ky., 884 S.W.2d 668, 671 (1994):

> [A] juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment. . . . The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict. *Id.*

4. Ky., 756 S.W.2d 131 (1988).

5. *Id.* at 137. *See also Morris v. Commonwealth*, Ky., 766 S.W.2d 58, 60 (1989) ("Both the Commonwealth and the defendant are entitled to a panel of jurors who will consider the entire range of punishment. Those who will not should be struck by the Court for cause." *Id.*).

6. *See Mabe v. Commonwealth, supra* note 3 at 670 ("The law recognizes that the trial court is vested with broad discretion to determine whether a prospective juror should be excused for cause." *Id.*).

we have soundly rejected the idea that a potential juror's answer to a "magic question" ends the discussion of his ability to serve.[7] Although Juror # 361 was questioned a number of times about his ability to consider the full range of penalties, he was directly asked once, and only once, whether he could consider the minimum penalty of twenty years if a jury had found a defendant guilty of intentional murder, and he stated that he could not. The juror's statement that he could "choose something other than death" is a far cry from an assurance that he could consider the *entire* range of penalties as the trial court would instruct him. Juror # 361's answers mirror those given by a juror who, according to the *Grooms* Court, should have been excluded.[8] Accordingly, I believe the trial court erred when it failed to excuse Juror # 361.

### I(B)—REVERSIBLE ERROR

Because I believe the trial court erroneously failed to sustain Stopher's challenge to Juror # 361 and because existing Kentucky caselaw requires reversal under such circumstances, I dissent from the result reached by the majority and would reverse Stopher's conviction and remand the case to the trial court for a new trial. I must express my discomfort with this result, however, because I cannot ascertain how Stopher suffered any tangible disadvantage from the trial court's ruling after

he used a peremptory challenge to remove Juror # 361 from the panel. I have carefully reviewed the videotaped record, and the general and individual voir dire revealed that each of the jurors who deliberated Stopher's crime and punishment could do so fairly and impartially. My reverse vote reflects only my conclusion that Stopher used one of his peremptory challenges to exclude a juror when he should not have had to do so.

I am struck by the incongruity of these two conclusions—Stopher was tried by a fair and impartial jury, and I must vote to reverse. Accordingly, I believe this is an appropriate time to express my opinion that this Court should reconsider existing precedent decreeing that automatic reversible error exists whenever a trial court error implicates a defendant's exercise of peremptory challenges.

This Court's adoption of RCr 9.40 allows the parties in a criminal[9] case to remove a given number of jurors by peremptory challenge without showing cause. While we currently provide a base allotment of eight (8) peremptory challenges to each side, the Commonwealth and the defense, in a felony criminal case and three (3) peremptory challenges to each side in a misdemeanor criminal case, we could allow a larger number of peremptory challenges, a smaller number,[10] and we could even delete the rule and provide for no peremp-

---

7. See *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713, 718 (1991).

8. *Supra* note 4 at 135–137.

9. My views expressed herein would apply equally to peremptory challenges exercised in civil cases.

10. In fact, the current allocation of peremptory challenges in felony cases has only existed since 1994, and over the past century, the number of peremptory challenges available to criminal defendants has decreased. From

1877 to 1893, the defense could exercise twenty (20) peremptory challenges. In 1893, the number of peremptory challenges allowed by the defense was reduced to fifteen (15). In 1978, the number of peremptory challenges given to the defense was reduced to eight (8). From 1877 until 1994, we allowed the Commonwealth to exercise only five (5) peremptory challenges. In 1994, we amended RCr 9.40 to eliminate the defense's numerical advantage, and we now allow the prosecution to exercise eight (8) such challenges.

tory challenges whatsoever in criminal cases. No provision of the United States Constitution requires peremptory challenge procedures in criminal cases:

> We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.[11]

While RCr 9.40 undoubtedly *allows* criminal defendants to exercise peremptory challenges, I have my doubts about this Court's conclusion that we must reverse a case whenever a trial court ruling infringes upon these "substantial rights."[12] Bestowing a substantial right upon the exercise of a peremptory challenge serves one function and one function only—it manufactures reversible error in cases where the case has been decided by a fair and impartial jury. The rhetorical label we have placed upon peremptory challenges does nothing more than circumvent the last sentence of RCr 9.24[13] and insulate a class of trial court rulings from harmless error analysis. When we attach the "sub-stantial right" label to the defendant's opportunity to exercise peremptory challenges, a defendant who cannot otherwise demonstrate prejudice[14] may now claim that he or she was denied a "substantial right" when a trial court ruling "required" the defense to use one of its challenges to remove a juror which the trial court should have removed for cause.

I can find no support for the contention that the ability to exercise peremptory challenges implicates substantial rights. None of the due process protections in the United States Constitution requires peremptory challenges:

> [T]here is no constitutional obligation to allow [peremptory challenges]. Peremptory challenges are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury.[15]

In *Swain v. Alabama*,[16] the United States Supreme Court recognized that while peremptory challenges existed at common law, "the source of this right was not whol-

---

11. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80, 90 (1988) (citations omitted).

12. *Thomas v. Commonwealth, supra* note 1 at 258–9 ("The rules specifying the number of peremptory challenges are not mere technicalities, they are substantial rights and are to be fully enforced." *Id.* at 259.).

13. "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the *substantial rights* of the parties." RCr 9.24.

14. E.g., when, as is the case here, the defendant subsequently used his or her peremptory challenges to exclude any juror whom the trial court improperly failed to excuse for cause. *See Turpin v. Commonwealth*, Ky., 780 S.W.2d 619, 621 (1989) *overruled by Thomas v. Commonwealth, supra* note 1 ("Turpin can demonstrate no prejudice or constitutional violation because the jurors were removed for cause by the defense." *Id.*); *Dunbar v. Commonwealth*, Ky., 809 S.W.2d 852, 853 (1991) *overruled by Thomas v. Commonwealth, supra* note 1 ("Even if a juror should have been removed for cause, such error does not violate the constitutional right to an impartial jury if the person did not actually sit on the jury." *Id.*).

15. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620, 111 S.Ct. 2077, 114 L.Ed.2d 660, 673 (1991).

16. 380 U.S. 202, 214, 85 S.Ct. 824, 13 L.Ed.2d 759, 769 (1965).

ly clear." [17] In *Ross v. Oklahoma*,[18] the High Court declined to view peremptory challenges as an unfettered right and noted the incongruity of the rights rhetoric with both the realities of exercising such challenges and the manner in which legislatures have modified them:

> We think there is nothing arbitrary or irrational about [requiring that a defendant use peremptory challenges to cure erroneous refusals by the trial court to excuse jurors for cause], which subordinates the absolute freedom to use a peremptory challenge as one wishes to the goal of empaneling an impartial jury. *Indeed, the concept of a peremptory challenge as a totally freewheeling right unconstrained by any procedural requirement is difficult to imagine.* As pointed out by the dissenters in Swain:
>
> > This Court has sanctioned numerous incursions upon the right to challenge peremptorily. Defendants may be tried together even though the exercise by one of his right to challenge peremptorily may deprive his codefendant of a juror he desires or may require that codefendant to use his challenges in a way other than he wishes. A defendant may be required to exercise his challenges prior to the State, so that some may be wasted on jurors whom the State would have challenged. Congress may regulate the number of peremptory challenges available to defendants by statute and may require codefendants to be treated as a single defendant so that each has only a small portion of the num-

ber of peremptories he would have if tried separately.[19]

In *United States v. Martinez–Salazar*,[20] the United States Supreme Court unanimously agreed that a defendant who uses a peremptory challenge to remove a juror whom the trial court erroneously declined to excuse for cause "has not been deprived of any rule-based or constitutional right" [21] because the defendant has the *choice* whether to exercise a peremptory challenge to remove that juror:

> After objecting to the District Court's denial of his for-cause challenge, Martinez–Salazar had the option of letting Gilbert sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal. Instead, Martinez–Salazar elected to use a challenge to remove Gilbert because he did not want Gilbert to sit on his jury. This was Martinez–Salazar's choice. The District Court did not demand—and Rule 24(b) did not require—that Martinez–Salazar use a peremptory challenge curatively.
>
> In choosing to remove Gilbert rather than taking his chances on appeal, Martinez–Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. Moreover, the immediate choice Martinez–Salazar confronted—to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error—com-

---

17. *Id.*

18. *Supra* note 11.

19. *Id.* at 487 U.S. at 90, 108 S.Ct. at 2279, 101 L.Ed.2d at 91 (emphasis added and citations omitted).

20. 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).

21. *Id.* at 528 U.S. 304, 307, 120 S.Ct. 774, 777, 145 L.Ed.2d 792 (citations omitted).

ports with the reality of the jury selection process.[22]

The United States Supreme Court observed no due process violation,[23] and the ·Circuit Courts of Appeal have applied this reasoning to both federal[24] and state[25] criminal matters.

Unquestionably, Kentucky may provide for rights not guaranteed by the United States Constitution, and our procedural protections may exceed those available on the federal level. In *Thomas*, this Court implied that the opportunity to exercise peremptory challenges constitutes a substantial right because of such challenges' importance for insuring procedural due process. In as much as *Edmonson v. Leesville Concrete Co.*[26] holds that the United States Constitution does not require that states allow defendants to exercise peremptory challenges, our prior holdings thus rest on the premise that Kentucky's due process protections extend further than that of the United States Constitution and that, in this state, fundamental notions of fair process require that we grant defendants a license to exclude jurors who can fairly and impartially deliberate. guilt/innocence and punishment. Even if we had not spent the last century eroding the extent of this "right" through gradual reductions in the number of peremptory challenges available to defendants in felony cases, I would dispute our "substantial rights" characterization because I can find no support for it in the Kentucky

Constitution. As the scope of this "right" changes with the phases of the moon, however, I cannot imagine how we ever concluded that the ability to exercise peremptory challenges is such an important right that prejudice may be presumed.

A brief recap may be in order—this Court has decided a defendant's exercise of peremptory challenges constitutes a "substantial right" despite the fact that no identifiable provision of either the United States or Kentucky Constitution compels such a conclusion. This epitomizes "rights talk," a term observers of the American legal system use to define our inclination towards the elevation into "rights" of all legal matters:

> The law talk that percolates through American society today, however, is far removed from nineteenth-century versions.... [L]aw talk in Tocqueville's day was not nearly so saturated with rights talk as it has been since the end of World War II. In short, legal speech today is a good deal more morally neutral, adversarial, and rights-oriented than it was in 1831.

> There is no more telling indicator of the extent to which legal notions have penetrated both popular and political discourse than our increasing tendency to speak ... in terms of rights, and to frame nearly every social controversy as a clash of rights. Yet, for most of our history, political discourse was not so

**22.** *Id.* at 528 U.S. 304, 315–16, 120 S.Ct. 774, 781–2, 145 L.Ed.2d 792.

**23.** *Id.* at 528 U.S. 304, 317, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 ("Martinez–Salazar and his codefendant were accorded 11 peremptory challenges, the exact number Rule 24(b) and (c) allowed in this case. Martinez–Salazar received precisely what federal law provided; he cannot tenably assert any violation of his Fifth Amendment right to due process." *Id.*).

**24.** *See, e.g., United States v. Quinn*, 230 F.3d 862, 865–6 (6th Cir.2000) ("By removing Juror # 35, Quinn exercised his peremptory challenge in the manner that it was intended to be used—to assure his right to an impartial jury.... The system worked precisely as intended." *Id.*).

**25.** *See, e.g., Wolfe v. Brigano*, 232 F.3d 499, 501–2 (6th Cir.2000).

**26.** *Supra* note 15.

liberally salted with rights talk as it is today, nor was rights discourse so legalistic. The high season of rights came upon the land only rather recently, propelled by, and itself promoting, a gradual evolution in the role of the courts.[27]

Such "rights talk" is by no means innocuous, and:

> [R]ights talk often operates at cross-purposes with our venerable rights tradition. It fits perfectly within the ten-second formats currently preferred by the news media, but severely constricts opportunities for the sort of ongoing dialogue upon which a regime of ordered liberty ultimately depends. A rapidly expanding catalog of rights ... risks trivializing core democratic values.[28]

I believe our characterization of peremptory challenges as substantial rights elevates form over substance and detracts from the true question of whether the trial court seated a fair and impartial jury to decide a defendant's guilt or innocence.

While reliance upon precedent is important, "the doctrine of stare decisis does not commit us to the sanctification of ancient fallacy."[29] I believe it is time for this Court to reexamine its decisional law concerning peremptory challenges used to excuse jurors whom the trial court has erroneously failed to excuse for cause. Rather than deeming such errors "automatic reversible error," we should bring Kentucky law in accordance with the prevailing federal jurisprudence.

## II. TESTIMONY OF DR. EVANS

I also write separately with respect to Section III(4) of the majority opinion which addresses the testimony of Dr. Ev-

ans because I see no reason for this Court to engage in an erroneous interpretation of our evidence rules to affirm a ruling which the trial court never made. After reviewing the video record in this case, I do not believe the trial court ever prohibited Dr. Evans from testifying that Stopher's behavior on the day he killed Deputy Hans indicated that Stopher was under the influence of a hallucinogen.

The Commonwealth initially asked that the trial court prohibit Dr. Evans from testifying in this regard. However, after the trial court held a hearing to ascertain the nature of and basis for this testimony, it ruled that Dr. Evans could testify as to the findings of a chemical analysis of Stopher's blood and urine samples and, if the testimony provided a proper foundation, to his opinions as to whether Stopher was under the influence of a hallucinogen. The Commonwealth suggested that, in light of the trial court's ruling, it intended to cross-examine Dr. Evans regarding Stopher's past violent criminal history, which Dr. Evans admitted he had not considered in forming his opinion, to contest the weight which the jury should assign to that opinion. After realizing the potential opportunity costs to soliciting a specific opinion from Dr. Evans, the defense decided, unilaterally, to limit the scope of its examination of Dr. Evans:

> Def: We'll accede to his [the prosecutor's] statement that Dr. Evans cannot make a specific finding as to his observations as to what Vincent Stopher did but instead present to the jury what the effects are of LSD and hallucinogens. We also say that we are entitled for him to testify as to foreign substances that he found.

**27.** Mary Ann Glendon, *Rights Talk: The Impoverishment of Political Discourse,* 3–4 (The Free Press 1991).

**28.** *Id.* at xi.

**29.** *Hilen v. Hays,* Ky., 673 S.W.2d 713, 717 (1984).

TC: I don't think there's any objection to that.

Def: Oh, I thought they were—he wanted it limited.

TC: After the court's acceptance, I think the Commonwealth's ruling was basically, on the chemical analysis—he could testify as to that basis.

Def: Very well. Well, he can testify as to—not specifically as to Vincent Stopher—but what the effects are.

TC: Right. And the effects of his chemical analysis.

Def: Yes.

Simply put, the trial court did not prevent the defense from introducing any of Dr. Evans's proffered testimony. The defense appears to have decided to "fold its hand" after concluding that the Commonwealth held a better one.[30] We have no ruling to review.

My review of the record leads me to the conclusion that the question of whether the trial court should have allowed Dr. Evans to testify to his opinion is largely academic. However, because the majority has erroneously decided that question, and the majority's incorrect legal conclusions will become the law of this case, I feel compelled to address those conclusions.

The majority opinion reaches three conclusions with respect to Dr. Evans's testimony: (1) Dr. Evans was qualified to testify as to his chemical analysis of Stopher's blood and urine, but not to give his opinion regarding whether Stopher's behavior at the time he killed Deputy Hans was consistent with someone affected by a hallucinogen; (2) Dr. Evans had no proper basis for his opinion; and (3) this testimony would not have assisted the jury's determination. I would note that the trial court made none of these findings, and that, in reaching these conclusions, the majority acts not as a reviewing court,[31] but as a finder of fact. The record in this case and the law in this Commonwealth squarely contradict each of these conclusions.

At the trial court's evidentiary hearing, Dr. Evans testified to his qualifications. On appeal, Stopher appropriately describes those qualifications as "impeccable." A *partial* list of those qualifications would include: (1) Bachelor of Science degrees in Biology and Chemistry; (2) A Ph.D. in Toxicology from the Indiana University School of Medicine; (3) Post-doctoral work in Toxicology at the National Institute of Health, (4) almost two decades of board certification in Toxicology; (5) teaching and research experience into the effects of drug abuse as a tenured Associ-

---

**30.** Stopher's brief never identifies an adverse ruling by the trial court and essentially admits that the defense "folded" on this issue:

After the Commonwealth threatened that it would (yet again) bring up Vince's past arrests and "the things he [Dr. Evans] does not know about Vince Stopher" the defense finally acceded to Dr. Evans not making specific findings as to his observations from the videotape recordings of Vince's actions the day of the crime or from listening to the descriptions of his behavior the day of the crime. (Essentially, the Commonwealth had managed, over defense objection, to get in front of the jury, on several occasions, alleged past arrests of Vince.) The defense did not want this to happen again and

therefore took the threat of the Commonwealth seriously. *Accordingly, Dr. Evans did not testify as to his determination* that the behavior of Vince the day of the crime was completely consistent with his being high on LSD.

*Brief for Appellant* at 84 (citations to record omitted and emphasis added).

**31.** *See Goodyear Tire & Rubber Co. v. Thompson*, Ky., 11 S.W.3d 575, 583 (2000) ("KRE 702 gives the trial court the discretionary authority, reviewable for its abuse, to determine admissibility of expert testimony in light of the particular facts and circumstances of the particular case." *Id.*); *Mitchell v. Commonwealth*, Ky., 908 S.W.2d 100, 102 (1995).

ate Professor of Medicine at the University of Illinois; and (5) over one hundred (100) scientific publications in his field, many of which addressed drug abuse issues and the effect of drugs upon human behavior. Dr. Evans defined the field of toxicology as "the study of the effect of drugs on the central nervous system and brain function as well as behavior" and emphasized that an important aspect of toxicology is the effect of drugs on human behavior. Dr. Evans, a former Indiana State Toxicologist, has testified in civil and criminal proceedings at the request of prosecutors and defense counsel as well as counsel for both plaintiffs and defendants. Dr. Evans was absolutely qualified to testify as to the effect hallucinogens have on human behavior and to express an opinion as to whether certain behaviors were indicative of hallucinogen use. The majority's conclusion is not only wrong but indefensible.

KRE 703(a) defines the permissible bases for an expert's opinions:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*[32]

At the evidentiary hearing, Dr. Evans testified that he based his conclusion that Stopher was under the influence of a hallucinogen on his findings from the chemical analysis of Stopher's blood and urine as well as witness interviews, discovery materials, and a videotape made of Stopher on the day he killed Deputy Hans which the defense provided to him. Dr. Evans testified that he commonly if not always forms his opinions on the basis of similar materials provided to him, and even before we adopted KRE 703, this Court believed that experts may rely on exactly these types of materials.[33] Although the Commonwealth argues that Dr. Evans's reliance on third-party information is improper, KRE 703, Kentucky case law, and common sense invalidate the contention that all experts must also be occurrence witnesses.

I cannot fathom how the majority can conclude that Dr. Evans's testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue."[34] There was never any issue in this case about *whether* Stopher killed Deputy Hans. The *only* relevant issue was Stopher's mental state at the time he did so and whether Stopher should receive the death penalty. Stopher's defense was that he was having a "bad" hallucinogenic trip at the time he killed Deputy Hans, and the defense argued that Stopher's culpability was thus reduced below intentional murder. The Commonwealth disputed this contention. Dr. Evans's testimony addressed this very issue.

The majority's contention that Dr. Evans's testimony would have been of little value because no test revealed LSD in Stopher's blood or urine ignores Dr. Evans's testimony that, because LSD is photosensitive and chemically decomposes when exposed to light, he would have been surprised to find LSD in the samples provided to him because those samples were neither frozen nor protected from light. Dr. Evans did testify, however, that his advanced tests on Stopher's urine sample

**32.** KRE 703(a) (emphasis added).

**33.** *See Buckler v. Commonwealth,* Ky., 541 S.W.2d 935, 940 (1976).

**34.** KRE 702.

indicated a ethyltriptomine-like substance which typically forms the chemical "backbone" of LSD, and which would be present if LSD in Stopher's system had decomposed. Dr. Evans's testimony that Stopher's behavior on the day in question was consistent with use of a hallucinogenic drug unquestionably would have satisfied the relevancy requirement of KRE 401 as evidence which made "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [35]

Stopher presents no reviewable issue concerning Dr. Evans's testimony because the trial court did not exclude that evidence. However, I cannot agree with the majority's gratuitous conclusion that the trial court should not have allowed Dr. Evans to testify as to his opinions because I find those conclusions clearly erroneous.

Under this Court's existing case law, the trial court committed reversible error when it overruled Stopher's challenge to Juror # 361. Thus, I would reverse and remand the case to the trial court for a new trial.

STUMBO, J., joins this dissent.

---

**35.** KRE 401. *See also Stringer v. Commonwealth*, Ky., 956 S.W.2d 883, 889–892 (1997) ("[J]urors ... usually do need the assistance of a medical expert in determining the cause of a physical condition in order to understand the evidence...." *Id.* at 890).