# Supreme Court of Kentucky

## 2018-SC-000437-MR

FINAL

DATE 9-10-20

a.h.hutcheson

LAYW THOMAS            APPELLANT

ON APPEAL FROM CHRISTIAN CIRCUIT COURT
V.            HONORABLE JOHN L. ATKINS, JUDGE
NO. 06-CR-00110 & 06-CR-00142

COMMONWEALTH OF KENTUCKY            APPELLEE

## ORDER CORRECTING

The Opinion of the Court rendered August 20, 2020 is corrected on its face by substitution of the attached Opinion in lieu of the original Opinion.

Said correction does not affect the holding of the original Opinion of the Court.

ENTERED: August 20, 2020

_____
CHIEF JUSTICE



# Supreme Court of Kentucky

## 2018-SC-000437-MR

DATE 9-10-20

LAYW THOMAS          APPELLANT

V.

ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
NO. 06-CR-00110 & 06-CR-00142

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>VACATING AND REMANDING</u>**

Layw Thomas, a youthful offender, appeals to us as a matter of right[1] from the circuit court's judgment sentencing him to prison for life plus fifty years. At sentencing, the trial court found Thomas ineligible for consideration for probation, presumably because Thomas, who was nineteen years old when he pleaded guilty, stood convicted of serious crimes that would place him in the violent offender category and render him ineligible for probation. Thomas raises several issues in this appeal of which we find no merit. But we do find merit in a single issue and hold that the violent offender statute is inapplicable to youthful offenders for the purposes of the trial court's consideration of probation, even if the youthful offender has reached the age of majority at the

---

[1] Ky. Const. § 110(2)(b).

2

time of sentencing. Consequently, the judgment is vacated, and the case returned to the trial court for resentencing consistent with this opinion.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A. *Proceedings leading to the first judgment that was set aside by the Court of Appeals.*

For crimes committed when he was seventeen years old, Thomas's charges were brought to the juvenile session of the district court, which transferred the charges to circuit court for Thomas's prosecution as a youthful offender under the provisions of KRS[2] 635.020(4). The charges wound up in two separate indictments in circuit court, and, by the time Thomas resolved the charges by entering guilty pleas under agreements with the Commonwealth, he was a nineteen-year-old adult.

In one indictment, in which he was represented by Eric Bearden, Thomas pleaded guilty to first-degree robbery, first-degree assault, second-degree assault, and wanton endangerment in exchange for a recommended twelve-year sentence. In the other indictment, in which Thomas was represented by William Aldred, Thomas entered an *Alford* plea[3] to murder for a recommended sentence of twenty years. This last plea agreement provided that the sentence would run concurrently with the sentence in the first-mentioned indictment. In short, the Commonwealth agreed to recommend all sentences to run concurrently for a total of twenty years' imprisonment.

---

[2] Kentucky Revised Statutes.

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

3

Both plea agreements included a "hammer clause,"[4] which stated the following: "Failure to appear at sentencing shall result in the Commonwealth moving to modify the sentence to the maximum sentence on all charge(s), to run consecutively, or to the maximum aggregate allowed by law." Neither plea agreement tallied the number of years a maximum prison sentence might contain.

At the plea colloquy conducted in the case involving the murder charge, the Commonwealth recommended a twenty-year sentence, denial of probation, and Thomas's release to remain at home wearing an electronic tagging device.[5] The trial court was also informed that Thomas was cooperating with the Commonwealth on matters beyond the scope Thomas's present charges. The trial court expressed reservations about the release terms offered to Thomas under the plea agreement but ultimately agreed.[6] Thomas went on to answer

---

[4] A hammer-clause provision is "a provision in a plea agreement which, in lieu of bail, allows the defendant, after entry of his guilty plea, to remain out of jail pending final sentencing. Generally, a hammer clause provides that if the defendant complies with all the conditions of his release and appears for the sentencing hearing, the Commonwealth will recommend a certain sentence. But, if he fails to appear as scheduled or violates any of the conditions of his release, a specific and substantially greater sentence will be sought." *Knox v. Commonwealth* 361 S.W.3d 891, 893–94 (Ky. 2012).

[5] The Commonwealth stated that it already checked to see if this arrangement would be possible because Thomas's mother, with whom Thomas lived, lived in Clarksville, Tennessee, and found that the GPS tracking was possible. The prosecutor did not ask, and the trial court did not verify, who would supervise Thomas's release, but the trial court directed Thomas to cooperate with the Kentucky Office of Probation and Parole.

[6] The trial court accepted the term in the plea agreement providing for Thomas's release pending the sentencing hearing after the Commonwealth and Thomas's defense attorney approached the bench and showed the trial court unidentified papers—presumably describing Thomas's cooperation with the Commonwealth—to peruse. The record does not identify these papers or disclose their content.

all the questions asked by the judge during the *Boykin*[7] plea colloquy. Thomas confirmed that he understood the terms of the plea agreement, that he understood that he would be waiving certain constitutional rights by pleading guilty, that he was given no promises to receive a certain sentence if he pleaded guilty, and that he was satisfied with counsel's representation.[8]

The trial court accepted Thomas's plea, finding that it was entered willingly, freely, intelligently, and voluntarily. The court then told Thomas that he must cooperate with Probation and Parole and come back to court for sentencing or he would receive the maximum sentence on both charges, to run consecutively. The trial court did not explicitly state the number of years the maximum sentence would be if Thomas failed to appear. But it did admonish Thomas that he had "a lot riding on this" agreement, to which Thomas replied, "You don't have to worry about that." The Commonwealth also included a verbal warning that he was not to commit any new crimes while on home incarceration or it would move to amend the plea agreements to reflect the maximum sentences. This condition was not contained in either written plea agreement, but Thomas stated that he understood he was not to commit more crimes.

The trial court entered a home incarceration order, and Thomas was released with an electronic ankle monitor to live with his mother in Clarksville,

---

[7] *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

[8] Thomas also provided these affirmative answers when asked these same questions by the trial court during the plea colloquy on the other indictment. The only substantive difference for the purposes of this case is that Thomas responded "yes" when the trial court asked him if he was satisfied with the representation provided to him by Bearden.

Tennessee. Thomas later failed to appear for the final sentencing hearing. He cut off the ankle monitor and disappeared.

When Thomas eventually came before the trial court, his pleas for leniency were rejected and the hammer clause provisions were enforced by imposing a life sentence with the fifty-year sentence to run consecutively. In the judgment, the trial court specifically noted that it sentenced Thomas to "Imprisonment because . . . the defendant is not eligible for probation." The trial court did not state the basis for Thomas's ineligibility. The trial court specifically found that the maximum sentences were imposed on account of "defendant having failed to appear as ordered for previous sentencing hearing in violation of the plea agreement."[9]

After unsuccessful motions for post-conviction relief over the ensuing seven years, Thomas, acting pro se, filed a motion for relief under CR[10] 60.02 (d), (e) and (f), arguing that the trial court had improperly imposed the hammer clauses at sentencing. The trial court denied CR 60.02 relief without a hearing.

On appeal, the Court of Appeals found merit in Thomas's argument that the trial court erred in sentencing him under the hammer clauses. The Court of Appeals reversed the trial court's denial of CR 60.02 relief, vacated the judgment, and remanded the case, finding that the trial court "did not exercise its independent judgment as to the proper sentence to be imposed under the applicable statutory law and rules of criminal procedure." The Court of Appeals

---

[9] The trial court arraigned Thomas on new charges of tampering with a prison monitoring device, escape and bail jumping following the final sentencing hearing.

[10] Kentucky Rules of Civil Procedure.

6

found that the trial court considered only Thomas's violation of the plea agreement and punished Thomas for that violation instead of imposing punishment for the underlying crimes.[11] Accordingly, the Court of Appeals held that Thomas was entitled to have the judgment set aside under CR 60.02(f)[12] because the trial court erred under the substantive rules established in *McClanahan v. Commonwealth*[13] and *Knox v. Commonwealth*[14] when it did not consider whether the sentences imposed for the underlying crimes were

---

[11] The Court of Appeals also rejected Thomas's argument that the trial court imposed an illegal sentence when it ordered the fifty-year sentence run consecutively to the life sentence, holding that a definite-term sentence may properly run consecutively to an indefinite-term sentence when the two sentences arise from different cases. *Higgins v. Commonwealth*, No. 2014-SC-000466-MR, 2016 WL 671150 (Ky. Feb. 18, 2016); *Clay v. Commonwealth*, No. 2009-SC-000012-MR, 2010 WL 2471862 (Ky. June 17, 2010). The Court of Appeals also rejected the Commonwealth's argument that Thomas's CR 60.02 motion was procedurally improper. The Court of Appeals found that Thomas's case "presented circumstances of such an extraordinary nature" necessary to invoke CR 60.02 relief even if other procedural steps were required to be followed by Thomas before bringing the CR 60.02 action. The Court of Appeals reasoned that Thomas was entitled to the extraordinary relief provided under CR 60.02 for many reasons, the "[m]ost glaring is that Thomas was denied counsel in his post-conviction proceedings[,]" despite repeated requests for assistance of counsel.

[12] CR 60.02(f) provides the following: "On motion a court may, upon such terms as are just, relieve a party or his legal representative from its final judgement, order, or proceeding upon the following grounds: . . . or (f) any other reason of an extraordinary nature justifying relief."

[13] 308 S.W.3d 694, 702 (Ky. 2010) (reversing the sentence imposed pursuant to the hammer clause in the plea agreement because the trial court failed to exercise independent discretion in setting the sentence, the sentence was imposed without giving due consideration to the presentence report, and the sentence was imposed without consideration of "the nature and circumstances of the crime and the history, character and condition of the defendant").

[14] 361 S.W.3d at 899 (holding that a "judge's commitment to impose a sentence based upon a defendant's breach of a hammer clause condition, coupled with the imposition of that sentence without proper consideration of other relevant factors, is an abuse of discretion").

appropriate considering all of the other factors required under RCr[15] 11.02,[16] KRS 532.050,[17] and KRS 533.010(2).[18]

## B. Proceedings leading to the judgment under review by this Court.

On remand from the Court of Appeals, the trial court denied Thomas's motion for recusal, finding that there was nothing in the record that showed bias against Thomas or called into question the trial court's objectivity or impartiality. But the trial court held an evidentiary hearing on Thomas's motion to withdraw his guilty pleas and final sentencing.

During the evidentiary hearing on the motion to withdraw his guilty pleas, Aldred and Bearden, Thomas's attorneys in the prior prosecutions, Rebecca DiLoreto, Director for the Institute on Compassionate Justice, and Thomas himself testified.

Aldred testified about his conduct in representing Thomas before and during plea negotiations, Thomas's cooperation with law enforcement,[19] and

---

[15] Rules of Criminal Procedure.

[16] RCr 11.02(1) provides, in part, that ". . .[b]efore imposing sentence the court shall, if the defendant is guilty of a felony, cause a presentence investigation to be conducted, examine and consider the report, and furnish a copy of the report to the attorney for the Commonwealth and the attorney for the defendant no later than two (2) business days prior to final sentencing...."

[17] KRS 532.050(1) provides, in part, that "[n]o court shall impose a sentence for conviction of a felony, other than a capital offense, without first ordering a presentence investigation after conviction and giving due consideration to a written report of the investigation . . . ."

[18] As this Court explained in *Knox*, KRS 533.010(2) directs the trial court, not only to *consider* "probation, probation with an alternative sentencing plan, or conditional discharge' before imposing a sentence, but to refrain from imposing a sentence of imprisonment unless, based upon 'consideration of the nature and circumstances of the crime and the history, character and condition of the defendant,' the court is of the opinion that: [one of the conditions provided in (a-c) applies in the particular case]". 361 S.W.3d at 896 (quoting KRS 533.010(2)).

[19] Aldred testified that he was reluctant to go into detail about the negotiations involving Thomas's cooperation with law enforcement because of the risk to Thomas.

8

his discussion of the hammer clauses with Thomas before signing the agreements.

Aldred, Thomas's retained counsel in the second indictment, testified that before negotiating the challenged plea, he conducted standard discovery, received all the evidence from the Commonwealth, visited the murder scene where he interviewed witnesses, and met with Thomas roughly fifteen times. Aldred stated that he did not collect Thomas's mental health or school records. Based on his investigation and review, Aldred concluded that Thomas could not succeed at trial. He began plea negotiations with the Commonwealth that included an offer to cooperate in other criminal investigations.[20] Aldred did not remember verbatim his discussions with Thomas about the terms of the plea agreement, but he met with Thomas three to five times to discuss the plea agreement and Thomas's cooperation with police. Aldred admitted that Thomas met with the prosecutor and police without him and that it was Thomas who informed Aldred that the Commonwealth might allow him to be released to go home before final sentencing.

As for the discussion with Thomas about the hammer clauses, Aldred testified that these clauses are common in plea agreements in the jurisdiction where Thomas was prosecuted. Before Thomas accepted the plea bargain, Aldred explained to Thomas and his mother the nature of the hammer clause,

---

The attorney further remarked that when he first heard that Thomas had cut his ankle monitor off and fled, the attorney feared that the "bad guys had gotten him."

[20] It appears from statements in the record that Thomas received favorable terms in exchange for his cooperation with law enforcement. But the record does not disclose the nature or extent of Thomas's cooperation.

9

including the potential consequences of violating it. Alfred also testified that he emphasized to Thomas that he was getting a favorable sentencing recommendation considering the gravity of the underlying charges and that if he failed to appear for sentencing or violated any other term of the agreement, he could go to prison for life. Aldred further testified that despite his youth, Thomas understood the plea agreements and the consequences of breaching their terms, and that Thomas could enter a knowing, intelligent, and voluntary plea.

Bearden, Thomas's appointed counsel in the first indictment, testified regarding his representation of Thomas before he entered the first guilty plea. The extent of Bearden's participation in the case is unclear, specifically in negotiating the plea agreements, but Aldred took the lead in representing Thomas during the plea negotiations. Bearden testified that he did not actively participate in the case after Thomas's family hired Aldred to represent Thomas in the murder case. Bearden did not meet with Thomas often, did not remember ever meeting with Thomas while he was held in juvenile detention, and did not remember participating in the plea negotiations. Like Aldred, Bearden confirmed that hammer clauses were standard in local plea agreements. Bearden also testified that he did not remember specifically discussing the plea agreement with Thomas but stated that it was his practice to go over the terms of any plea agreement offered to his clients. Finally, Bearden testified that he did not remember Thomas making any statements that suggested a lack of understanding of the plea agreements.

10

DiLoreto described the process she has routinely undertaken when representing juveniles. Although she admitted that she never met Thomas and was not involved in negotiating the plea agreements, DiLoreto flatly stated that she would not have allowed Thomas to commit to the hammer-clause provisions. She based that statement on information she gleaned from her review of Thomas's school and medical records, which disclosed that Thomas had a demonstrated history of problems with impulsivity and resistance to authority. DiLoreto testified that, had she represented Thomas pre-trial, she would have had a more in-depth discussion with him about his goals beyond simply being released from jail before sentencing because she did not believe Thomas could succeed on release under the circumstances as they existed at the time of negotiations.

Finally, Thomas testified on his own behalf about Bearden's and Aldred's representation during plea negotiations. Thomas stated that Bearden did not discuss the plea agreement with him before the guilty-plea proceeding. Instead, Bearden brought the plea agreement to Thomas on the day of the scheduled court date and Thomas signed it without discussion. Regarding Aldred's representation, Thomas stated that while he had discussed his desire to go home and the possibility of a plea agreement with Aldred a couple of times before signing the agreement, Aldred only discussed the specific agreement regarding home incarceration for about five minutes before Thomas "appeared at the podium." According to Thomas, Aldred did not review each term of the plea agreement with him, and neither Aldred nor Bearden discussed the possible consequences of failure to appear for sentencing. Thomas

acknowledged that the trial court did inform him of the consequences of pleading guilty and the effect of the hammer clauses, recalling the trial court's warning that he would receive the maximum sentence if he did not appear for sentencing. Thomas testified that he did not understand the magnitude of what he was agreeing to when he signed the plea agreements, and he described the struggles he faced in his personal life that caused him to flee.[21]

At the close of the evidentiary hearing, the trial court denied Thomas's motion to withdraw his guilty pleas. The trial court articulated the standard for withdrawing a guilty plea from *Edmonds v. Commonwealth*[22] and found that Thomas was aware of the direct consequences at the time he entered the plea. The trial court observed that Thomas was not a child but a savvy person who knew what he was doing at the time he entered the plea. The trial court entered the following order:

> Having conducted a hearing and heard the arguments of counsel and considered the case law relevant to this motion, the court finds that the defendant's guilty plea was entered knowingly, intelligently and voluntarily, that his lawyers were effective and that he was aware of the ramifications of failing to follow his release conditions. The motion to withdraw his plea is denied.

The sentencing hearing immediately followed the denial of Thomas's motion to withdraw his guilty pleas. At the sentencing hearing, Thomas called to testify on his behalf: Dr. Lawrence Steinberg, a professor of psychology

---

[21] Most importantly, Thomas explained that he fled because his mother's landlord threatened to evict her if Thomas did not leave the home. While Thomas's mother and Aldred were attempting to make other arrangements for Thomas to move out, Thomas cut off his ankle monitor and fled.

[22] 189 S.W.3d 558, 566 (Ky. 2006).

specializing in adolescent development; Thomas's mother; and Brian Westover, a family friend.

Dr. Steinberg described the lack of impulse control common in teenagers, a characteristic that persists past the teenage years through ages twenty-two or twenty-three. Thomas's mother, a friend, and Thomas himself all testified about Thomas's character before he committed the offenses, his character now that he is in his thirties, and about plans for Thomas's life if he were to be released from prison. Thomas testified again about the problems he faced on home incarceration and about his achievements since he has been in prison, including completing parenting, anger management, and drug rehabilitation courses.

At the end of the sentencing hearing, the trial court found that the original sentence imposed under the hammer clauses was the most appropriate sentence. The trial court stated that considering all the evidence presented during the evidentiary hearing and the final sentencing hearing, as well as the contents of the written PSI and the nature and circumstances of Thomas's charges, history, character and condition, it believed that Thomas's guilty pleas were proper, as was the Commonwealth's request to enforce the hammer clause. The trial court entered the following written order:

> A separate sentencing hearing having been conducted where the defendant testified and presented testimony of other witnesses and having heard the arguments of counsel, and considered all the statutory requirements of sentencing, the court finds that imposition of a sentence consistent with the original plea agreement subject to the "hammer clause" implications is appropriate. The judgement so stating is incorporated here by reference.

13

The trial court again imposed a life sentence and a fifty-year sentence, to run consecutively. And as in the first judgment, the trial court ruled that it sentenced Thomas to "imprisonment because. . . [Thomas] is not eligible for probation." Again, the judgment does not explain the trial court's basis for its determination that Thomas was ineligible for probation, and Thomas's counsel did not raise any question to the determination at that time.

## II. ANALYSIS

Thomas raises several issues on appeal. First, he argues that the trial court erred in denying his motion to withdraw his guilty plea. Second, he argues that the trial court erred in denying his recusal motion. Finally, Thomas raises several arguments in support of his assertion that, even if his guilty pleas were voluntary, the trial court erred by imposing the challenged sentence. The Commonwealth disputes Thomas's first two claims of error but concedes that the trial court erred by failing to consider probation before imposing the sentence of imprisonment.

For the reasons explained below, we find that the trial court did not abuse its discretion in denying Thomas's motion to withdraw his guilty pleas nor in denying recusal. But we agree with Thomas, as conceded by the Commonwealth, that the trial court erred in failing to consider probation or another form of conditional discharge in accordance with KRS 533.010 before sentencing Thomas to imprisonment.

### A. The trial court did not err by failing to allow Thomas to withdraw his guilty pleas.

RCr 8.10 provides, in part, that "[a]t any time before judgment the court may permit the plea of guilty or guilty but mentally ill, to be withdrawn and a

14

plea of not guilty substituted." We have previously established that the use of the word "may" in the statute indicates that a trial court has discretion to determine whether to allow a defendant to withdraw a guilty plea, but this discretion is not "unfettered."[23] To determine whether the trial court erred when it denied Thomas's motion to withdraw his guilty pleas, we must conduct a two-step analysis.

First, we must determine whether the trial court erred in finding that Thomas's guilty pleas were voluntary.[24] This determination is subject to the clearly erroneous standard of review,[25] meaning that the trial court's ruling on that issue stands if supported by substantial evidence.[26] If there is no clear error in finding the pleas voluntary, we must then determine if the trial court abused its discretion by not allowing Thomas to withdraw his guilty pleas.[27] A trial court abuses its discretion when it makes a decision that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[28]

---

[23] *Rodriguez v. Com.*, 87 S.W.3d 8, 10 (Ky. 2002).

[24] *See id.*; *Bronk v. Commonwelath*, 58 S.W.3d 482, 487–88 (Ky. 2001); *Rigdon v. Com.*, 144 S.W.3d 283, 288 (Ky. App. 2004).

[25] *Edmonds*, 189 S.W.3d at 566; *Rigdon*, 144 S.W.3d at 288 (citing *Bronk*, 58 S.W.3d at 489 (Cooper, J. concurring)).

[26] *See, e.g., Edmonds*, 189 S.W.3d at 566 (explaining that to determine whether a ruling was made in clear error, the question is "whether the determination was supported by substantial evidence"); *Bronk*, 58 S.W.3d. at 488 ("Our review of the totality of the circumstances surrounding Bronk's plea finds substantial evidence that supports the trial court's finding.").

[27] *Rigdon*, 144 S.W.3d at 288 (explaining that if the trial court finds that a plea was entered voluntarily, it is within the discretion of the trial court to grant or deny a motion to withdraw) (internal citations omitted). In contrast, if a trial court finds that a plea was involuntary the trial court is *required* to grant a defendant's motion to withdraw. *Id.*

[28] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable,

15

In *Edmonds v. Commonwealth*, we explained that:

A guilty plea is involuntary if the defendant lacked full awareness of the direct consequences of the plea or relied on a misrepresentation by the Commonwealth or the trial court. . . . A guilty plea is intelligent if a defendant is advised by competent counsel regarding the consequences of entering a guilty plea, including the constitutional rights that are waived thereby, is informed of the nature of the charge against him, and is competent at the time the plea is entered.[29]

A presumption of voluntariness arises from a properly conducted plea colloquy under *Boykin v. Alabama*,[30] but simply looking at the colloquy is not enough to determine that a guilty plea is voluntary. Trial courts must further consider the totality of circumstances surrounding the plea, an inherently fact-sensitive inquiry.[31]

The crux of Thomas's claim of error on the voluntariness issue turns on the alleged ineffectiveness of trial counsel. He adds that his pleas were not voluntary and intelligent because the prosecutor added terms at the guilty-plea hearing. Finally, he argues that cognitive characteristics affecting teenagers like him distorted his appreciation of the consequences under the hammer clauses of failing to appear for sentencing. Thomas claims that but-for these

---

unfair, or unsupported by sound legal principles."); *see also Rigdon*, 144 S.W.3d at 288 (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

[29] 189 S.W.3d at 566 (citing *Brady v. United States*, 397 U.S. 742, 755–56, 90 S.Ct. 1463, 1472–73, 25 L.Ed.2d 747 (1970); *Boykin*, 395 U.S. at 243, 89 S.Ct. at 1712, 23 L.Ed.2d 274).

[30] 395 U.S. at 242–44, 89 S.Ct. at 1711–12, 23 L.Ed.2d 274 ("A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment. . . 'Presuming waiver [of several federal constitutional rights that are involved when a guilty plea is entered] from a silent record is impermissible.'").

[31] *Edmonds*, 189 S.W.3d at 566; *Rodriguez*, 87 S.W.3d at 10–11 (citing *Brady*, 397 U.S. at 749); *Leyra v. Denno*, 347 U.S. 556, 558, 74 S.Ct. 716, 717, 98 L.Ed. 948 (1954); *Bronk*, 58 S.W.3d. at 486).

circumstances, he would not have signed a plea agreement that involved a hammer clause. We find no merit in any of these arguments.

With respect to the ineffective assistance of counsel claim, Thomas argues specifically that his trial counsels' performance was deficient because they failed to: (1) investigate adequately his background before advising him to accept the plea offers; (2) investigate adequately the underlying charges; (3) accompany him in all negotiations with the Commonwealth; (4) satisfy their duty to explain the terms of the plea agreement in terms he could understand; (5) ensure that he could comply with home incarceration; (6) warn against accepting a plea deal that contained a hammer clause; and (7) explain the sentences that could be imposed under the hammer clause if he violated the terms of the plea agreements.

We considered similar arguments in *Bronk v. Commonwealth*,[32] a case in which Bronk was prosecuted in circuit court as a youthful offender for crimes he committed in connection with a fire in which a firefighter was killed.[33] After Bronk failed a polygraph examination that his counsel arranged but failed to attend, Bronk confessed to his involvement in the fire. [34] He later agreed to plead guilty and testify against a co-defendant in exchange for a recommended sentence of twenty-five years' imprisonment.[35] The trial court accepted Bronk's guilty plea, but postponed final sentencing until after the co-defendant's trial.[36]

---

[32] 58 S.W.3d. 482.

[33] *Id.* at 484.

[34] *Id.* at 485.

[35] *Id.*

[36] *Id.*

17

Before the co-defendant's trial, the trial court granted Bronk's motion to appoint new counsel, who in turn moved to withdraw his guilty plea based on the assertion that he entered the plea involuntarily because his counsel provided ineffective assistance.[37] The trial court denied Bronk's motion to withdraw his guilty plea, and he was sentenced in accordance with the plea agreement.[38]

On appeal to this Court, Bronk argued that the trial court erred in denying his motion to withdraw his guilty plea because his first counsel's ineffective assistance rendered his plea involuntary.[39] He claimed that his retained counsel's performance was deficient because, among other reasons, he failed to conduct any independent investigation of the case and to accompany him to the polygraph examination.[40]

In denying relief, this Court stated that whenever a defendant disputes the voluntariness of a guilty plea based on claims of ineffective assistance of counsel, trial courts must apply the following standard:

> In cases where the defendant disputes his or her voluntariness, a proper exercise of this discretion requires trial courts to consider the totality of the circumstances surrounding the guilty plea and juxtapose the presumption of voluntariness inherent in a proper plea colloquy with a *Strickland v. Washington*[41] inquiry into the performance of counsel: A showing that counsel's assistance was ineffective in enabling a defendant to intelligently weigh his legal alternatives in deciding to plead guilty has two components: (1) that counsel made errors so serious that counsel's performance fell outside the wide range of professionally competent assistance; and (2) that the deficient

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.* at 486.

[41] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

18

performance so seriously affected the outcome of the plea process that, but for the errors of counsel, there is a reasonable probability that the defendant would not have pleaded guilty, but would have insisted on going to trial. Evaluating the totality of the circumstances surrounding the guilty plea is an inherently factual inquiry which requires consideration of the accused's demeanor, background and experience, and whether the record reveals that the plea was voluntarily made.[42]

In applying the standard above, this Court found in *Bronk* that the trial court did not abuse its discretion when it found that, despite acknowledged errors made by counsel, Bronk's plea was voluntary.[43] The Court found that there was substantial evidence to support the trial court's finding given that, among other things, the trial court relied on the testimony of the original judge that, despite his awareness of Bronk's retained counsel's deficiencies, he still believed that Bronk's plea was voluntarily entered, Bronk was an adult at the time he pleaded guilty, Bronk appeared to be "articulate and to have an above-average comprehension of the proceedings," and Bronk was given an opportunity during the plea colloquy to retract his plea and inform the court that he was dissatisfied with his retained counsel.[44] Furthermore, the Court emphasized that Bronk faced life in prison and the plea agreement involved a more lenient sentence and earlier parole-eligibility date.[45]

Like the defendant in *Bronk*, Thomas was transferred to circuit court to be tried as a youthful offender but entered the guilty pleas after he reached the age of majority. Thomas also points to failures by his trial counsel like defense

---

[42] *Bronk*, 58 S.W.3d. at 486–87.

[43] *Id.* at 487–88.

[44] *Id.*

[45] *Id.* at 488.

19

counsel's alleged failures in *Bronk*. Thomas claims that: Bearden's conduct was deficient because he failed to represent him during plea negotiations and to appear to represent him during the original sentencing hearing; Aldred's conduct was deficient because he failed to accompany Thomas to all plea negotiations with the Commonwealth;[46] and both Bearden and Aldred failed to adequately investigate Thomas's background and the circumstances surrounding the underlying charge.[47]

Thomas also raised claims of deficient representation by counsel that are novel in comparison to the claims made in *Bronk*. Thomas claims that his attorneys had a duty to communicate with him in a different way than they would with adult offenders because he was proceeding in the case as a youthful offender, was only nineteen at the time his accepted the plea bargains and had ADHD and a documented history of conflict with authority. Thomas further argues that these same characteristics required his trial counsel not only to ensure that he had adequate guidance while on home incarceration but, more importantly, to refrain from advising Thomas to accept a plea bargain that involved a hammer clause. In support of these arguments, Thomas relies on DiLoreto's testimony[48] and on the Supreme Court's decisions

---

[46] Bronk claimed that his trial counsel was ineffective because he failed to accompany Bronk when he went to take a polygraph examination at the police department. *Bronk*, 58 S.W.3d. at 486.

[47] Bronk also claimed that his trial counsel "failed to interview witnesses or otherwise investigate the case. . . .[and] to review with Bronk the discovery materials provided by the Commonwealth." *Id.*

[48] Specifically, DiLoreto's testimony regarding how the law applies differently to juveniles based on the brain science on juvenile cognitive development, and regarding how Supreme Court Rules (SCR) 3.130(1.4) and 3.10(1.4) apply to require attorneys to

in *Roper v. Simmons*,[49] *Graham v. Florida*,[50] *Miller v. Alabama*,[51] and

*Montgomery v. Louisiana*.[52]

Thomas argues that Diloretto's testimony and the decisions in *Roper* and

the cases following it indicate that the law requires youths to be treated

differently in some circumstances to comport with the Eighth[53] and

Fourteenth[54] Amendments of the United States Constitution. We disagree with

Thomas that this is one of those cases. Here, based on the totality of the

circumstances surrounding Thomas's guilty pleas, we find that Thomas's case

is more akin to *Bronk* and supports the trial court's finding that Thomas's

pleas were voluntarily entered. We acknowledge that, at the very least,

Bearden's apparently lackadaisical approach may have fallen "outside the wide

range of professionally competent assistance."[55] We further acknowledge that

---

communicate with client's in different way when the client suffers from "diminished capacity," including that of which is due to age.

[49] 543 U.S. 551, 578, 125 S.Ct. 1183, 1200, 161 L.Ed.2d 1 (2005) (ruling that imposing the death penalty on offenders who are convicted of crimes committed when they were under the age of eighteen is unconstitutional under the Eighth and Fourteenth Amendments).

[50] 560 U.S. 48, 82, 130 S.Ct. 2011, 2034, 176 L.Ed.2d 825 (2010) (ruling that the Eighth and Fourteenth Amendments prohibit the sentence of life without the possibility of parole for juvenile offenders who did not commit homicide).

[51] 567 U.S. 460, 479, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012) (ruling that the Eighth and Fourteenth Amendments prohibits any sentencing scheme that mandates life without the possibility of parole on any juvenile offender).

[52] 136 S.Ct. 718, 736 193 L.Ed.2d 599 (2016) (holding that *Miller* is retroactive).

[53] U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[54] U.S. CONST. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws").

[55] *Id.*

21

Thomas alleges additional instances of ineffective assistance of counsel that are different than the claims presented in *Bronk*. But we cannot say, even taken together, that Bearden's and Aldred's performance "so seriously affected the outcome of the plea process that, but for the[se] errors . . . there is a reasonable probability" that Thomas would not have pleaded guilty but instead insisted on going to trial.[56]

Thomas was not a juvenile when he entered these guilty pleas. Bearden and Aldred both testified that Thomas seemed like an intelligent man, and that he never did or said anything that indicated that he could not fully understand the terms of the plea agreements. Aldred took the lead in representing Thomas in the plea negotiations for both indictments, which resulted in a potentially lenient disposition for Thomas in both cases. Thomas was competent enough to negotiate, alone, with the Commonwealth in a way that convinced the prosecutor to agree to allow him to return to his mother's home in Clarksville, Tennessee, before final sentencing while still recommending a total sentence of twenty years. And while it is disputed that Thomas was explicitly told that if he did not appear for sentencing the hammer-clause provisions in the plea agreements could cause him to be sentenced to life plus 50 years, Aldred testified that he emphasized the hammer-clause provision to Thomas before he entered the plea and explained that it was crucial that Thomas show up for sentencing. Even if Thomas did not know he could receive a life sentence plus fifty years, he knew that he received a very favorable recommendation from the

---

[56] *Bronk*, 58 S.W.3d. at 486–87.

Commonwealth and he knew that if he did not follow the terms of both the written agreement and those explained to him orally during the guilty-plea hearing, that he could receive a life sentence.

Thomas also argues that even if his guilty plea were voluntarily entered, the trial court still abused its discretion by denying his motion to withdraw the pleas based on: the disparity between the sentence offered in exchange for the pleas and the sentence actually imposed; the ineffective assistance of counsel in failing to investigate his case and advise him of the consequences of violating the plea agreement; and the ultimate imposition of a "grossly unfair sentence," especially considering the "great benefit" Thomas provided through his cooperation with the Commonwealth and law enforcement.[57]

As stated above, a trial court abuses its discretion when it renders a decision that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[58] These arguments are essentially the same as the arguments addressing the voluntariness issue, and we reject them for the same reasons.[59] Accordingly, we find that the trial court did not abuse its discretion by denying Thomas's motion to withdraw his guilty pleas.

---

[57] The record does not reflect the extent of Thomas's cooperation with law enforcement and the Commonwealth.

[58] *English,* 993 S.W.2d at 945; *see also Rigdon,* 144 S.W.3d at 288.

[59] *See Bronk,* 58 S.W.3d. at 486–87; *see also Simpson v. Commonwealth,* No. 2007-SC-000623-MR, 2009 WL 735878 *1, *6–*7 (Ky. Mar. 19, 2009) (rejecting defendant's argument that the court abused its discretion in denying his motion to withdraw his voluntary guilty plea).

## B. *The trial court did not err in denying Thomas's motion asking the judge to recuse.*

Thomas further argues that the trial court erred by denying his motion for recusal. Thomas asserts that considering the Court of Appeals' holding that the trial court erroneously imposed the first sentence based solely on the hammer clause instead of considering all the factors required by law, the same trial court "could not preside over the resentencing without letting that bias affect its decisions or appearing to be partial to the hammer clause sentence."

In support of this argument, Thomas relies primarily on the trial court's earlier judgment and its pointed statements made to Thomas and Thomas's mother from the bench. Thomas cites to SCR 4.300 Canon 3E(1)(a) of the Judicial Code of Ethics, KRS 26A.015, and supporting case law for rules governing recusal. In response, the Commonwealth argues that relying on an adverse ruling in prior proceedings is not enough to satisfy the "onerous" burden of proof required for recusal of a trial judge and that the record discloses no bias against Thomas. We agree with the Commonwealth that Thomas did not satisfy his burden of showing that the trial court should have recused and find no abuse of discretion in the trial court's denial of that motion to recuse.

Supreme Court Rule (SCR) 4.300, Canon 3E of the Judicial Code of Conduct, provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances [where] the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]" "The burden of proof

24

required for recusal of a trial judge is an onerous one. There must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'"[60] A court's denial of a motion for recusal is reviewed for abuse of discretion, which again is defined as "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[61]

In *Minks v. Commonwealth*, this Court upheld a trial court's denial of the defendant's recusal motion, which he filed before a hearing on his motion to suppress evidence obtained upon execution of a search warrant signed by the same judge.[62] And in *Dunlap v. Commonwealth*, this Court upheld the trial court's denial of the defendant's recusal motion despite the fact that the judge previously presided over a custody case involving the victims of the defendant's crimes.[63] In *Dunlap*, the Court distinguished the circumstances in that case from those present in *Sommers v Commonwealth*,[64] a case in which this Court held that a judge should have recused himself from a murder case in which he had previously presided over the guardianship case that placed the murder victims in the custody of the defendant, and the judge had accessed media outlets to defend his custody decision after the murders were committed.[65]

---

[60] *Dunlap v. Commonwealth*, 435 S.W.3d 537, 590 (Ky. 2013) (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 794 (Ky. 2001)).

[61] *Id.* at 587 (quoting *English*, 993 S.W.2d at 945).

[62] 427 S.W.3d 802, 806 (Ky. 2014).

[63] *Dunlap*, 435 S.W.3d at 590.

[64] 843 S.W.2d 879 (Ky. 1992).

[65] *Dunlap*, 435 S.W.3d at 591.

25

We agree with Thomas that the trial court's on-the-record statements that were directed at Thomas's mother reflected the trial court's irritation over Thomas's failure to appear for final sentencing. But it is clear from the authorities cited above that this Court has been reluctant to disqualify a judge unless the judge's conduct is egregious, or the claims of impartiality or bias are based on more than an adverse ruling. We disagree that the trial court's angry words or previous sentencing decision were evidence that the judge was incapable of presiding fairly and impartially in the present matter. And we reject Thomas's argument that the trial court's failure to embrace his arguments in mitigation of punishment raises legitimate concern over the trial court's lack of impartiality. A trial court is not required to impose a more lenient sentence simply because evidence is presented that could justify mitigation.[66] The trial court is only required to give due consideration to such mitigating evidence.

### C. *The trial court erred in sentencing Thomas, a youthful offender, without first considering probation or another form of conditional discharge as a sentencing option.*

Finally, Thomas offers four arguments in support of his assertion that, even if his guilty pleas were voluntary, the trial court erred by denying his request to impose the original twenty-year sentence. First, Thomas argues that the trial court violated Kentucky's Juvenile Code and KRS 533.010 in determining the sentence. Second, Thomas argues that the trial court violated KRS 532.110 in determining the sentence. Third, Thomas argues that the trial

---

[66] *Prater v. Commonwealth,* 421 S.W.3d 381, 384 (Ky. 2014) (explaining that sentencing is a discretionary function of the trial court and therefore subject to review for abuse of discretion).

court ignored this Court's holdings in *Knox* and *McClanahan* and KRS 533.010 by again imposing the hammer-clause sanction in lieu of a sentence. Finally, Thomas argues that even if the trial court did not violate *Knox* and *McClanahan*, considering all the mitigating evidence presented in favor of imposing the sentence available under the original terms of the plea agreement, the trial court still abused its discretion by imposing the maximum sentence available under the law. Thomas also requests that this court hold that a hammer clause that results in a maximum sentence for a youthful offender violates state and federal constitutions.

We find merit only in Thomas's first argument and agree that the trial court erred by failing to follow the directives of Kentucky's Juvenile Code by imposing a sentence of imprisonment in violation of KRS 533.010, which requires consideration of probation, conditional discharge, or an alternative sentence before imposing imprisonment. It appears that the trial court and counsel for both sides—who failed to raise the issue before the trial court— erroneously assumed Thomas was ineligible for probation.

Thomas primarily relies on KRS 533.010, KRS 600.010(2) and KRS 640.030 to argue that the trial court violated Kentucky's Juvenile Code. Specifically, Thomas argues, and the Commonwealth agrees, that the special probation rules under KRS 635.020(4), KRS 640.040(3) and *Merriman v. Commonwealth*[67] required the trial court, before imposing the challenged sentence, to determine whether probation or another form of alternative

---

[67] 265 S.W.3d 196, 198–201 (Ky. 2008).

sentence was appropriate for Thomas. The trial court did not consider these alternative sentencing options because it found that "the Defendant is not eligible for probation," but the trial court does not state for the record its reason for finding Thomas ineligible. And even though Thomas himself failed to raise the issue of probation eligibility before the trial court, sentencing issues may be raised for the first time on appeal.[68]

KRS 533.010(1) provides that "[a]ny person who has been convicted of a crime and who has not been sentenced to death may be sentenced to probation, probation with an alternative sentencing plan, or conditional discharge as provided in this chapter." KRS 533.010(2) provides that "[b]efore imposition of a sentence of imprisonment, the court **shall** consider probation, probation with an alternative sentencing plan, or conditional discharge. **Unless** the defendant is a violent felon as defined in KRS 439.3401 or a statute prohibits probation . . . ."[69] And KRS 533.060(1) provides, in part, that "[w]hen a person has been convicted of an offense or has entered a plea of guilty to an offense classified as a Class A, B, or C felony and the commission of the offense involved the use of a weapon from which a shot or projectile may be discharged

---

[68] *Jones v. Commonwealth*, 382 S.W.3d 22, 27 (Ky. 2011) (explaining that the statement made in *Cummings v. Commonwealth*, 226 S.W.3d 62, 66 (Ky. 2007), that sentencing is jurisdictional was "simply [] a manifestation of the non-controversial precept that an appellate court is not bound to affirm an illegal sentence just because the issue of the illegality was not presented to the trial court); *Hughes v. Commonwealth*, 875 S.W.2d 99, 100 (Ky. 1994) (finding that it could still consider appellant's argument that the trial court was required to consider appellant's request for probation under KRS 533.010 before sentencing him pursuant to his unconditional plea agreement even though the appellant did not raise this argument before the trial court because "all defendants have the right to be sentenced after due consideration of all applicable law[]") (citations omitted).

[69] (emphasis added).

that is readily capable of producing death or other serious physical injury, the person shall not be eligible for probation . . . ."

These statutes establish that a trial court must consider probation for an adult defendant before imposing a sentence of imprisonment unless: (1) the defendant has been sentenced to death;[70] (2) the crime of which the defendant stands convicted falls within one of the categories outlined in KRS 533.060; or (3) the defendant is considered a violent offender as defined in KRS 439.3401.[71] But this standard is different when the defendant being sentenced committed the underlying crimes before he or she reached the age of majority and was transferred to circuit court to be prosecuted as a youthful offender.[72]

The crimes for which Thomas entered pleas would certainly render him ineligible for probation consideration by operation of either KRS 533.060(1) or KRS 533.010(2) if the crimes had been committed after he reached the age of

---

[70] KRS 533.010(1) ("Any person who has been convicted of a crime and who has not been sentenced to death may be sentenced to probation. . .").

[71] KRS 533.010(2). KRS 439.3401 defines a "violent offender" as, among other things, "any person who has been convicted of or pled guilty to the commission of: (a) A capital offense; (b) A Class A felony;(c) A Class B felony involving the death of the victim or serious physical injury to a victim. . . ."

[72] KRS 635.020(4) provides that "[a]ny other provision of KRS Chapters 610 to 645 to the contrary notwithstanding, if a child charged with a felony in which a firearm, whether functional or not, was used in the commission of the offense had attained the age of fourteen (14) years at the time of the commission of the alleged offense, he shall be transferred to the Circuit Court for trial as an adult if, following a preliminary hearing, the District Court finds probable cause to believe that the child committed a felony, that a firearm was used in the commission of that felony, and that the child was fourteen (14) years of age or older at the time of the commission of the alleged felony. If convicted in the Circuit Court, he shall be subject to the same penalties as an adult offender, except that until he reaches the age of eighteen (18) years, he shall be confined in a facility or program for juveniles or for youthful offenders, unless the provisions of KRS 635.025 apply or unless he is released pursuant to expiration of sentence or parole, and at age eighteen (18) he shall be returned to the sentencing Circuit Court for proceedings consistent with KRS 640.030(2)."

majority. But, as the parties agree, even though Thomas was transferred to the circuit court to be tried as an adult under KRS 635.020, he was still entitled to the protections provided for youthful offenders under Kentucky's Juvenile Code.[73] With respect to KRS 533.060, Kentucky's Juvenile Code explicitly states that the probation limitations contained in KRS 533.060(1) are inapplicable to youthful offenders like Thomas.[74] With respect to KRS 533.010(2), while none of the provisions of Kentucky's Juvenile Code explicitly states that KRS 533.010(2) is inapplicable to youthful offenders, based on our holdings in *Merriman v. Commonwealth*,[75] *Buckner v. Commonwealth*,[76] and *Edwards v. Harrod*,[77] it is perhaps unclear whether the statute is applicable to youthful offenders who are sentenced after they reach age eighteen.[78]

---

[73] KRS 600.020(72) defines a "youthful offender" as "any person regardless of age, transferred to Circuit Court under the provisions of KRS Chapter 635 or 640 and who is subsequently convicted in Circuit Court."

[74] KRS 640.040(3) provides that "No youthful offender shall be subject to limitations on probation, parole or conditional discharge as provided for in KRS 533.060."

[75] 265 S.W.3d at 198–201.

[76] No. 2006–SC–000479–MR, 2008 WL 5051578 (Ky. Nov. 26, 2008).

[77] 391 S.W.3d 755, 760–62 (Ky. 2013).

[78] KRS 640.030 provides, in part, that ". . . any sentence imposed upon the youthful offender shall be served in a facility or program operated or contracted by the Department of Juvenile Justice. . . If an individual sentenced as a youthful offender attains the age of eighteen (18) prior to the expiration of his sentence, and has not been probated or released on parole, that individual shall be returned to the sentencing court. At that time, the sentencing court shall make one (1) of the following determinations: (a) Whether the youthful offender shall be placed on probation or conditional discharge; (b) Whether the youthful offender shall be returned to the Department of Juvenile Justice to complete a treatment program, which treatment program shall not exceed the youthful offender's attainment of the age of eighteen (18) years and five (5) months . . . or (c) Whether the youthful offender shall be incarcerated in an institution operated by the Department of Corrections[.]"

As indicated above, Thomas argues, and the Commonwealth agrees, that this case should be remanded for resentencing because the trial court was required under KRS 533.010(2), *Merriman, Buckner,* and *Edwards* to consider whether probation or another form of conditional discharge was an option for Thomas before imposing a sentence of imprisonment. While we agree with the parties that our decisions in *Merriman, Buckner,* and *Edwards* are relevant and instructive, these cases did not decide the precise issue now before us: whether the probation limitation for violent offenders contained in KRS 533.010(2) applies to youthful offenders sentenced after they reach the age of majority? As explained below, we now hold, consistent with our holdings in *Merriman, Buckner,* and *Edwards,* that considering "statutory interpretation, logic, and belief in the good sense of the legislature,"[79] the violent offender statute is not applicable to youthful offenders who are convicted or sentenced after they reach the age of majority.

In *Merriman v. Commonwealth,* we held that the violent offender statute cannot be used to render youthful offenders ineligible for probation because the youthful-offender sentencing scheme contained in KRS 640.030 contemplates that the offenders will be brought back to court for "resentencing" upon reaching age eighteen.[80] In *Merriman,* two youthful offenders were convicted of the crimes charged, committed to the Department of Juvenile Justice in accordance with KRS 640.030(2), and thereafter brought back to the

---

[79] *Merriman,* 265 S.W.3d at 201.

[80] *Id.* at 198–201.

31

trial court for resentencing once they reached the age of majority.[81] In determining whether the violent-offender statute should have been applied to render the respective offenders ineligible for probation at their resentencing hearings, we reviewed relevant provisions of Kentucky's Juvenile Code.

We explained in *Merriman* that Kentucky's Juvenile Code was enacted to provide rules for treatment of individuals who commit crimes before they reach the age of majority and discussed multiple provisions contained in KRS Chapter 640 that apply to youthful offenders who are transferred to the Circuit Court to be tried as an adult.[82] The Court placed emphasis on the resentencing scheme required when a juvenile who has been tried and sentenced as an adult:

> to be housed in a juvenile detention facility until his sentence expired, he was probated or paroled, or he reached his 18th birthday. If the juvenile turned 18 before expiration, probation, or parole, then the sentencing court had to make further adjudications, which in common parlance came to be called "resentencing." In fact, the length and all other conditions of the Youthful Offender's sentence remain the same except for whatever statutory determinations the trial court makes at that review. The court's options at that point are to place the Youthful Offender on probation or conditional discharge, incarcerate him in adult prison, or return him to the Department of Juvenile Justice to complete a treatment program of up to five months. Under the latter option, the youthful offender again returns to the court after completing a treatment program for it to determine whether to probate, conditionally discharge, or incarcerate.[83]

---

[81] *Id.* at 197–98.

[82] *Id.* at 198–201. The *Merriman* court also noted that KRS Chapter 640 must be read with the legislature's intent in mind: "[P]romoting protection of children"; that "[a]ny child . . . under KRS Chapters 600 to 645 . . . shall have a right to treatment reasonably calculated to bring about an improvement in his condition"; "providing each child a safe and nurturing home"; and that "all parties are assured prompt and fair hearings," plus other specific intentions." *Id.* at 199 (citing KRS 600.010).

[83] *Id.* at 198–99 (explaining KRS 640.030 (1–3)).

Based on the language of KRS 640.030(2), we held that the violent offender statute "cannot act to prevent consideration of probation or conditional discharge on the youthful offender's 18th birthday."[84]

A short time after *Merriman* was decided, in *Buckner,* an unpublished opinion, this Court relied on *Merriman* to find that a defendant who was charged and convicted for crimes committed when he was seventeen years old was not subject to the violent offender statute and held that he was entitled to a new sentencing hearing "in accordance with KRS 640.030 and *Merriman.*"[85] And then in *Edwards* we considered *Merriman* to determine "whether youthful offenders who are convicted and sentenced in circuit court can also be classified as violent offenders subject to the parole-eligibility restrictions imposed by Kentucky's Violent Offender Statute."[86] In *Edwards* we found that *Merriman* "does not extend to the parole limitations of the Violent Offender Statute because of the difference between probation and parole" and because the General Assembly explicitly intended for the violent offender statute's parole restrictions to apply to certain youthful offenders.[87]

We acknowledge that there are several factual differences between *Merriman* and Thomas's case, and that the "resentencing" scheme in KRS 640.030(2) does not apply in the same way to Thomas's case as it did to the defendants in *Merriman*. Thomas is considered a youthful offender under KRS

---

[84] *Id.* at 200.

[85] 2008 WL 5051578 at *1, *12.

[86] 391 S.W.3d at 756.

[87] *Id.* at 756, 758–60.

33

600.020(72) for the purposes of underlying charges and was transferred to the circuit court to be tried as an adult.[88] But Thomas was nineteen years old when he entered his guilty pleas and was sentenced. Unlike the defendants in *Merriman*, he was not transferred to the Department of Juvenile Justice to await resentencing under KRS 640.030(2). This does not mean that *Merriman* is inapplicable here. In fact, we ruled in *Buckner* that a defendant in circumstances very similar to Thomas's was entitled to resentencing and probation consideration under *Merriman* and later cited *Merriman* in support of its statement in *Edwards* that "[a]lthough the legislature did not intend the probation constraints on violent offenders to apply to youthful offenders, it did' intend to subject youthful offenders to the parole restrictions of the Violent Offender Statute." As such, we must determine whether the violent offender statute is applicable to youthful offenders like Thomas who were sentenced after they reached the age of majority.

There are other subsections of KRS 640.030, as well as other provisions of KRS Chapter 640 that were not relevant in *Merriman* that indicate that the legislature intended for probation to be available as a sentencing option for youthful offenders, even when such offenders qualify as a violent offender and are sentenced after they reach the age of majority. Again, under KRS 640.030(2), when a youthful offender reaches the age of majority and is returned to the trial court for resentencing, "the length and all other conditions

---

[88] KRS 600.020(72) defines a "youthful offender" as "any person regardless of age, transferred to Circuit Court under the provisions of KRS Chapter 635 or 640 and who is subsequently convicted in Circuit Court."

34

of the Youthful Offender's sentence remain the same **except for whatever statutory determinations the trial court makes at that review**." The "determinations" available for youthful offenders who reach the age of majority are "to place the Youthful Offender on probation or conditional discharge, incarcerate him in adult prison, or return him to the Department of Juvenile Justice to complete a treatment program of up to five months." KRS 630.030(3) provides that those youthful offenders who have "attained the age of eighteen (18) years but less than eighteen (18) years and five (5) months prior to sentencing" shall also be returned for resentencing when they are eighteen years and five months old, and the trial court is again directed to make the same "determinations," including whether the defendant is a good candidate for probation.[89]

Also, KRS 640.075(1) provides that youthful offenders who were committed to the Department of Corrections under KRS 640.030(2)(c) may, until age twenty-one, remain in the custody of the Department of Juvenile Justice under some circumstances. KRS 640.075(4) then provides that the "youthful offender whose custody has been retained under subsection (1) of this

---

[89] KRS 640.030(3) (explaining that the youthful offender who was sentenced after he turned 18 "shall be returned to the sentencing court upon attaining the age of eighteen (18) years and five (5) months if that individual has been sentenced to a period of placement or treatment with the Department of Juvenile Justice. The court shall have the same dispositional options as currently provided in subsection (2)(a) and (c) of this section[]"). Again, the determinations to be made by the sentencing court under KRS 640.030(2)(a) & (c) are "[w]hether the youthful offender shall be placed on probation or conditional discharge[]" or "[w]hether the youthful offender shall be incarcerated in an institution operated by the Department of Corrections[.]"

section . . . may, on one (1) occasion and after the completion of a minimum twelve (12) months additional service of sentence, petition the sentencing Circuit Court for reconsideration of probation and, except as provided in KRS 439.3401, may be considered for early parole eligibility."

While it is true that the clear mandates of the resentencing scheme provided under KRS 640.030 would not be frustrated to the same extent as it would have been by an alternate holding in *Merriman* if this Court were to rule that the violent offender statute does apply to youthful offenders such as Thomas, we still think that the General Assembly intended for trial courts to consider whether youthful offenders are viable candidates for probation even if such individuals qualify as violent offenders.

First, as seen above, there are multiple provisions of KRS Chapter 640 that provide for trial courts that are sentencing youthful offenders to consider probation as a sentencing option. Nowhere in the Juvenile Code does the General Assembly place a limit on this option based on the violent offender statute. In contrast, the General Assembly explicitly states that the limitations provided under the violent offender statute do apply to youthful offenders' *parole* eligibility. While this citation to the violent offender statute is not determinative, it does indicate that the General Assembly was cognizant of the potential applicability of the violent offender statute to certain provisions of the Juvenile Code and chose not to provide that the violent offender statute applies to youthful offenders' probation eligibility, even after this Court's rulings in *Merriman, Buckner,* and *Edwards.*

36

Second, even though Thomas, because he was over the age of eighteen years and five months at the time he was initially sentenced, was not first committed to the Department of Juvenile Justice and then brought back for resentencing in accordance with KRS 640.030(1) or (3), he was sentenced as a youthful offender in the first instance. While the language of KRS 640.030(3) does contemplate the return of a defendant for resentencing, it also directs, without exception, for trial courts to make the same "determinations" provided under (2)(a) & (c), including whether the defendant is a good candidate for probation. It seems to us illogical to assume that because a youthful offender was age eighteen years and five months, or older, and thus was not committed to the Department of Juvenile Justice under KRS 640.030(1) or (3) in the first instance, that he is not entitled to the same probation consideration that is guaranteed to a youthful offender who was sentenced before he reached age eighteen years and five months.

Finally, this holding seems to best represent the intent of the General Assembly in enacting the Juvenile Code. KRS 600.010(2)(a) provides, in part, that "KRS Chapters 600 to 645 shall be interpreted to effectuate the . . . express legislative purposes[, including that] [t]he Commonwealth shall direct its efforts to promoting protection of children[.]" Similar to the consequences of an alternate holding discussed in the previous paragraph, it also seems to us illogical to hold that this Court's decision in *Merriman* was correctly made in light of this purpose, but this purpose would not be equally served by entitling those youthful offenders who are sentenced after they reach age eighteen years and five months the same protection provided in *Merriman*. Also, KRS

600.010(2)(f) further provides that "KRS Chapter 640 shall be interpreted to promote public safety and the concept that every child be held accountable for his or her conduct through the use of restitution, reparation, and sanctions, in an effort to rehabilitate delinquent youth." We emphasize that today we merely hold that trial courts must consider probation for youthful offenders who also qualify as violent offenders before committing them to the Department of Corrections. This Court's current holding does not undermine the trial court's ample discretion to hold youthful offenders fully accountable for their actions but simply provides for an additional avenue for rehabilitating delinquent youth.

### III. CONCLUSION

In sum, we hold that Kentucky's Juvenile Code and this Court's holdings in *Merriman, Buckner,* and *Edwards* support the conclusion that the violent offender statute is not applicable to youthful offenders for purposes of consideration of probation, even if they are sentenced after they reach age eighteen years and five months. Because the trial court here sentenced Thomas to a term of imprisonment under the assumption that Thomas was ineligible for probation, the trial court erred in failing to consider whether probation or other forms of conditional discharge as possible alternatives. So, we are constrained to vacate the judgment in this case and remand to the trial court once again to resentence Thomas in accordance with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Todd Dryden Ferguson
Office of the Attorney General